THE FIFTH NATIONAL BANK

*v.*

THE VILLAGE OF HYDE PARK.

*Filed at Ottawa September 26, 1881—Rehearing denied March Term, 1882.*

1. TRUST—*when stranger to fund is chargeable as a trustee.* To charge a stranger to a trust fund as a trustee, by reason of participation in a misapplication of the fund, upon the ground that the fund was used in payment of a private debt of the original trustee, it is necessary to show not only that the party sought to be charged was aware that the fund was a trust fund, but also that he was at the time aware that the debt paid by it was in fact a private debt, or such a debt that payment thereof could not lawfully be made out of such fund.

2. If a depositor pays his own debt to a banker by a check upon funds to his credit in a fiduciary capacity, the banker will be affected with knowledge of the unlawful character of the appropriation, and will be compelled to

refund to the *cestui que trust;* but the debt paid must be such as that the officers of the bank are aware that the same is really and in truth the private debt of such depositor.

3. A treasurer of a village borrowed money of a bank on his own note, secured by valuable collaterals, professing at the time to be borrowing the same for the village to pay off its warrants in anticipation of the collection of its taxes, and such money was placed to his account in bank as treasurer, and most of it applied in payment of village warrants, and after the receipt of the taxes he gave the bank a check upon the trust fund in payment of his note, and the bank in good faith, believing the debt to have been incurred for the village, accepted the payment and surrendered the note and collaterals: *Held,* that the payment could not be rescinded by the village, and the bank be held responsible for the money so paid it.

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the Circuit Court of Cook county; the Hon. MURRAY F. TULEY, Judge, presiding.

In April, 1873, A. D. Waldron became treasurer of the village of Hyde Park, and entered upon his duties as such. He continued to hold the office (being from time to time selected as his own successor) until May, 1878, when he was succeeded in that office by Geo. A. Follensbee. On May 20, 1873, he opened an account, in his individual name, with the Fifth National Bank of Chicago, in which account he deposited funds of the village coming to his hands as such treasurer, and so continued to do until the 11th day of June, 1877, paying dues of the village from time to time by checks on that bank, signed "A. D. Waldron," and charged against that account. On that date he closed that account, and opened a new account with the same bank in the name of "A. D. Waldron, Treasurer," by transferring the amount at that time to his credit as "A. D. Waldron," to the new account. He continued the account under the head of "A. D. Waldron, Treasurer," until May, 1878. At that time it was discovered that he was a defaulter to the village in the sum of $114,-032.62. Thereupon he was removed from office, and his successor was appointed, and the amount of the defalcation

was afterwards reduced to the sum $76,636.13, by credits on account of property of Waldron turned over to the village on that account. Waldron, from that time to his death, appears to have been without property or assets, and wholly insolvent.

This is a suit brought in January, 1879, by the village of Hyde Park, against Waldron and the Fifth National Bank. The bill charges that Waldron misapplied a large part of the village funds in his hands, and asks an account to fix the amount, and also that the bank received a large amount of the misapplied funds under such circumstances as to render it liable as trustee in that regard; that Waldron is insolvent, and prays that the bank be required to refund to the village the funds so received, to be applied in satisfaction of Waldron's defalcation.

Pending the suit, and before final hearing, Waldron died, and as to him and his estate the suit was abated. The bank answered, a replication was filed, and the cause was finally brought to a hearing on pleadings and proofs. The circuit court found that for no part of the moneys paid by Waldron to the bank by checks on his deposit account while the account was kept in the individual name of "A. D. Waldron," could the bank equitably be charged, but that as to certain moneys of the village paid by Waldron to the bank by checks on his deposit account while the account was kept in the name of "A. D. Waldron, Treasurer," in payment of certain loans made by Waldron, and for which he had given his own promissory note, the bank was chargeable as trustee for the use of the village, and rendered a decree against the bank and in favor of the village for the sum of $57,959.95, and interest thereon from the coming in of the answer. From this decree the bank appealed to the Appellate Court, and there the decree was affirmed. From that judgment of the Appellate Court the bank appeals to this court.

It appears from the record in this cause, that the predecessor of Waldron, as treasurer of the village of Hyde Park,

kept the moneys of the village in his hands on deposit in bank, in a deposit account in his own name. When Waldron opened his first account with the Fifth National Bank, as stated above, it was known to the bank that he was the treasurer of Hyde Park, and that the first deposit in that account was the sum of $30,602, received by him as treasurer from his predecessor as funds of the village, and that a large part, if not all, of the moneys deposited while the account was kept in his own name, were in fact funds of the village. Waldron testifies that in this account he did not deposit or mix with funds of the village any of his own private or personal moneys, and there is no proof in the record contradicting this statement. But no proof tends to show that the bank officers knew that *all* the moneys so deposited were funds of the village. While Waldron was treasurer, while the account was kept in the name of A. D. Waldron, several loans were made from the bank, avowedly for the use of the village. Part of them were made by him in his individual name and on his personal credit, supported by personal securities and collaterals, and part of these loans were made in the name and upon the credit of the village, and one of them was made in the name of one Lawrence, and secured by Lawrence's note, signed by Waldron as security, and supported by collaterals. Of loans thus made was one on June 24, 1873, made upon a certificate given in the corporate name of the village, and signed by the president and treasurer thereof, for the sum of $35,000; another was made on July 27, 1874, in the name of the village, on a certificate signed by appropriate officers thereof, for the sum of $35,000. Both these loans were duly authorized by appropriate resolutions passed by the board of trustees of the village. The funds so borrowed were deposited to the credit of the account of A. D. Waldron.

During 1875 and 1876 Waldron borrowed money from this bank on several different occasions, giving his own notes for

the same, secured by collaterals, and the sums borrowed credited to his deposit account in the bank. Some of these notes were renewed from time to time, and they were all ultimately paid by checks drawn upon his account, kept, as above stated, in his individual name. These loans, not including the renewal notes, with a like loan of $4000, made May 17, 1877, amounted in all to about $89,000.

On the 11th of June, 1877, Waldron made another loan from this bank, of the sum of $52,000, and gave his own note, signed by Lawrence as security, for the sum of $45,000, and the note of Lawrence, signed by Waldron as security, for the sum of $7000, and both these notes were secured by collaterals then deposited by Waldron with the bank.

The proceeds of all these loans were at once passed to the credit of A. D. Waldron, in which, up to that time, all the moneys of the village coming to his hands as treasurer had been deposited.

As to each of these loans so made in the years 1875, 1876, and 1877, embracing the last loan of June 11, 1877, Mr. Lombard, the cashier of the bank, testifies that Waldron stated, at the time of making each loan, that he "wanted the money for the use of Hyde Park, to pay warrants in anticipation of the collection of taxes."

On June 11, 1877, after the proceeds of this loan of $52,000 was passed to his credit on the books of the bank, Waldron applied to the cashier of the bank for a certificate of his balance in the bank, which was accordingly made out and presented to him, when Waldron said he wished a statement that the balance shown stood to his credit *as treasurer*. Thereupon the account was changed on the books of the bank, by closing the account as kept up to that time simply in the name of "A. D. Waldron," and opening a new account in the name of "A. D. Waldron, Treasurer," and the credit balance in the first account was transferred to the new account as a credit balance. This was done by a check signed by

Waldron, payable to himself as treasurer, and indorsed to the bank by him as treasurer. This credit was to the amount of $53,247.82, and to the extent of $52,000 was composed of the money that day loaned to Waldron, upon his statement that he wanted the money for the use of Hyde Park, to pay warrants in anticipation of the collection of taxes. A written statement was then given to "Waldron, Treasurer," that the balance to credit of his account was $53,247.82. He thereafter kept no account with this bank in the form of a private account. He afterwards made additional deposits to this new account, from time to time, until May, 1878. These deposits aggregated more than $300,000. No loans were made to him, as treasurer or otherwise, after the deposit account to this new form. At the time when the form of the account was changed, June 11, 1877, the bank held the Lawrence note of that date for $7000, and the Waldron note of that date for $45,000, and also a note of Waldron, given for the sum of $4000, of date of May 27, 1877, given for a loan made for the same avowed purposes and under like circumstances with the loan of June 11, 1877.

These loans of May and June, 1877, were afterwards paid to the bank by Waldron, by means of checks drawn by him as treasurer, and charged to the deposit account kept by him in the name of "A. D. Waldron, Treasurer." The last payment on that account was made December 1, 1877, by a check for the sum of $50,688.88, given in payment of "balance of $52,000, loan and interest." After the deposit of the moneys arising from this loan, and before the final payment on December 1, 1877, this deposit account had at one time been reduced, by checks drawn thereon, to the sum of $474.17, and was again replenished on the 30th of November, 1877, by a deposit of $97,826.31,—known to the bank officers to be. the money of the village,—consisting of two checks drawn by the county treasurer, payable to "A. D. Waldron,

treasurer of Hyde Park," and indorsed to the bank by him, as treasurer.

Mr. LYMAN TRUMBULL, Mr. CHARLES HITCHCOCK, and Mr. MELVILLE W. FULLER, for the appellant:

The decree should be reversed and the bill dismissed, because the village can not keep the bonds pledged as collaterals, and at the same time recover the money paid the bank to procure their surrender.

He who seeks equity must do equity. The bank is now called upon to make restitution of money alleged to have been wrongfully paid to it by the treasurer, but without any fraud or bad faith on the part of the bank. Upon this payment it gave up most important rights of property, which the village has since acquired.

In order to hold a bank liable for paying out trust money there must be a misappropriation in fact, and participation in, or privity with, such breach of trust on the part of the bank.

All the cases show that without pre-concert and knowledge of the breach of trust a bank can not be held liable. There must be proof, as Lord CAIRNS says in *Gray* v. *Johnston,* 3 Eng. & Irish Appeals, p. 11, that "the bankers are privy to the intent to make this misapplication of the trust funds."

The liability, in *Bodenham* v. *Hoskyns,* 13 Eng. L. & Eq. 222, (21 L. J. N. S. 864,) much relied on by appellee's counsel, was declared to be founded on the actual knowledge of, and participation in, the misapplication.

A *cestui que trust* can not stand by and permit the trustee to borrow money upon the representation that it is for the benefit of the *cestui que trust,* and then repudiate the action of the trustee in paying the loan. Still less can a *cestui que trust* recover back from a creditor money paid him to take up a loan, which the creditor made in the belief to the knowledge of the *cestui que trust* that it was for the benefit of, and assented to by, the latter.

Messrs. LEAMING & THOMPSON, Mr. CHARLES H. WOOD, and Mr. L. D. CONDEE, for the appellee:

1.   A trust will be enforced not only against a rightful possessor of trust property as trustee, but against all persons coming into possession of such property with notice of the trust.   *In re Gross,* 6 Law Rep. C. 632; *Bodenham* v. *Hoskyns,* 13 Eng. L. & E. 222; Morse on Banks and Banking, pp. 37, 45, (2d ed.); 2 Story's Eq. Jur. sec. 1707, and note a; Perry on Trusts, sec. 840.

2.   If trust property be commingled by the trustee with his own property, it does not thereby, in the view of equity, lose its character, but remains the property of the *cestui que trust.*   *Van Allen* v. *American National Bank,* 52 N. Y. 1; *Bodenham* v. *Hoskyns,* 13 Eng. L. & E. 222; *Same,* 21 id. 645; Morse on Banks and Banking, (2d ed.) p. 49; *Pennell* v. *Deffell,* 4 De Gex, Mc. & G. 382.

3.   If a party dealing with a trustee has, at the time, reasonable grounds for believing that he intends to misapply trust property, or is in the very transaction applying it to his own private use, a court of chancery will hold the person so dealing responsible for any injury sustained by the *cestui que trust.*   *Field* v. *Schieffelin,* 7 Johns. Ch. 150; *Jandon* v. *National City Bank,* 8 Blatch. 430; *Pannell* v. *Hurley et al.* 2 Collier, 244.

4.   A person fraudulently receiving or possessing himself of trust property, is converted by a court of chancery into a trustee for parties beneficially interested in such property, and the same rights and remedies exist against him as against an express trustee fraudulently committing a breach of trust.   *Norton et al.* v. *Hixon,* 25 Ill. 439; *Bank of Greensboro* v. *Clapp,* 76 N. C. 482; *Jackson et al.* v. *Norris et al.* 72 Ill. 367; *Bridgeman* v. *Gill,* 24 Beav. 302; *Shaw* v. *Spencer,* 100 Mass. 382.

5.   The appropriation or application of public funds in payment of private indebtedness is not within the scope of

the powers conferred upon the corporate authorities of municipal corporations, and no consent can be presumed on the part of such authorities to an act *ultra vires.* *Jackson ex rel.* v. *Norris et al.* 72 Ill. 364; *Bradley* v. *Ballard,* 55 id. 413; *Taylor* v. *People,* 66 id. 326.

Mr. Justice Dickey delivered the opinion of the Court:

It is conceded that no one had the slightest suspicion that Waldron was a defaulter, until some time in 1878, and about the first of May of that year. There is nothing in the proofs tending to show that any of the officers of the bank had any suspicion that Waldron was, or had at any time been, applying the moneys of the village to the payment of any claim or demand which (as between him and the village) he was in duty bound to pay from his own personal funds.

It is insisted by counsel for the village of Hyde Park, that the several loans made of this bank by Waldron in his own name, and upon his own notes or the notes of other private persons, were mere *private debts,* and not debts for which the village was liable, and inasmuch as the bank officers knew that the payment of these loans was made from funds known by them to be the funds of the village, they insist that such payment was known to them to be a misappropriation of the trust funds. The learned judge of the circuit court took this view of the matter, in so far as concerns payments made after the account was kept in the name of "A. D. Waldron, Treasurer." He held otherwise, however, so far as regards payments made out of the account kept in the name of "A. D. Waldron." In Morse on Banks and Banking, 37, it is said, in general terms: "If a depositor seeks to pay *his own debt to the* banker by an appropriation of the funds to his credit in a fiduciary capacity, then the banker is affected with knowledge of *the unlawful character* of the appropriation, and will be compelled to refund." It seems plain, however, that unless the debt to which the funds are thus applied

be such that the officers of the bank are aware that the same is really and in truth "*his own debt*," knowledge of the unlawful character of the appropriation can not be imputed to the bank.

To charge a stranger to a trust fund as a trustee, by reason of participation in a misapplication of the fund, upon the ground that the fund was used in payment of a private debt of the original trustee, it is necessary to show not only that the party sought to be charged was aware that the fund was a trust fund, but also that he was aware that the debt to the payment of which it was applied, was, at the time of such application, in fact a private debt,—a debt of such character that the fund in question could not lawfully be applied in payment thereof.

In *Keame et al.* v. *Robarts et al.* 4 Maddox Ch. 357, it is well stated, as the result of the authorities at that time (1819), that "every person who acquires personal assets by a breach of trust * * * is responsible to those who are entitled to the fund, if he is *a party* to the breach of trust." And again: "Generally speaking, he does become a party to the breach of trust by buying or receiving in pledge any part of the personal assets, not for money advanced at the time, but in satisfaction of his private debt, because this sale or pledge is *prima facie* inconsistent with the duty of an executor." This implies that the debt in satisfaction of which the property is taken, is of such character that it is known to be a private debt, for it is elsewhere declared that the party so receiving the trust fund must, to become chargeable, have been guilty of "fraud, collusion, or gross negligence." In the same case the vice-chancellor says: "If a party dealing with an executor for the personal assets, pays his money to the executor so that it *may* be applied to the purposes of the will, he is not responsible for the executor's misapplication of it; but if, in dealing with the executor, he does in truth pay his money for the private purposes of the executor, he is equally

a party to the breach of trust whether he applies his money
to the private debt of the executor, or to the private trade of
the executor, and this because he knows that the object to
which the money is applied is not an object to which it may
be lawfully applied."

In *Field* v. *Schieffelin*, 7 Johns. Ch. 150, Chancellor KENT
says, in substance, that to charge a third party with partici-
pation in the misapplication of trust funds by a trustee, the
proof must "justify the conclusion of a breach of trust, in
which the party to be charged *knowingly* partook." That was
the case of a guardian, and Kent, after a review of all the
then cases, says they all agree that a party dealing with an
executor is safe if he is no party to his fraud, and has no
knowledge or proof that he intended to misapply the proceeds,
and was not in fact by the very transaction applying them
to the extinguishment of *his own* private debt. This neces-
sarily refers to a debt known to be *his own* debt, to which the
fund could not be properly applied.

We have examined with care all the cases referred to by
counsel for appellee, and many others, where a party receiv-
ing trust funds in payment of a private debt to himself has
been held chargeable as a trustee, and we find no case among
them where the party so charged was not aware, at the time
of receiving such trust funds, that the debt to which it was
applied was a debt to the payment of which the trustee *could
not* lawfully apply the trust fund. The receipt of such money,
under such circumstances, is a plain fraud.

Let us consider a moment the character of these debts,
which in this case are called private debts. The debt for the
loan of $52,000, made on June 11, 1877, may be taken as
an example. Waldron called at the bank, saying he wished
to borrow a given sum of money for the use of the village
of which he was treasurer, to pay warrants in anticipation of
the collection of taxes. The money was, upon that statement,
lent to him upon his own personal note, secured by collater-

als. There was no fraud in believing this statement to be true, nor is there any proof that it was not true. The money thus lent was placed to his credit as treasurer, and paid out by him on checks drawn by him as treasurer, a large portion of which is proven to have been paid upon proper warrants upon the treasury, and no part of which is shown to have been paid out for other purposes. The bank assumed, and had a right to assume, that this money was intended to be applied to the proper payment of valid warrants, in anticipation of the collection of taxes, and on the 1st of December, 1877, one day after a large amount of money had come into the treasury from the collection of taxes by the county treasurer, when Waldron proposed to use so much of that fund in paying off the unpaid balance of that loan, the officers of the bank were authorized to assume, and in good faith did assume, that the money was by such payment being applied in refunding money paid out on such warrants on the treasury from the proceeds of the original loan. If this were true in fact, it was not a misapplication of the trust fund, but was a proper and just application of the fund. Had Waldron had abundant means of his own, and had he, when there was no money in the treasury, paid with his own money warrants properly drawn upon the treasury to the amount of $50,000, he would have thereby in equity become entitled (by subrogation to the rights of the holders of such warrants) to apply to his own use so much of the public moneys afterwards coming to his hands as needed to refund to him the amounts so advanced.

It follows that, under the circumstances, at the time when the officers of this bank received payment of this loan, they were not aware that, as between the village of Hyde Park and Waldron, he had not lawfully and equitably the right to apply the public funds to the payment of this debt. They must be assumed to have known the law in relation to the transaction, but the law does not impute to them omniscience

as to the facts. Taking the facts as these officers believed they were, and as they had good cause to believe, the payment would not have been a misappropriation of the funds. They are not chargeable with fraud, collusion, or gross negligence.

The case *In re Gross*, 6 L. R. 632, C. App., is cited as against this position, but it is not in point. There, as here, the funds were known to be trust funds. There, as here, the funds may be said to have arisen from moneys advanced by the bank upon the personal credit of the officer and trustee, but at the time when it was proposed by the bank to apply the trust fund to the private account of the officer, it was known that the officer was in default, and had the officer been present and offered to so apply the trust fund, called the "police fund," the bank could not at that time have accepted the same without being knowingly a party to the misapplication. The court said: "If a banker receives from a customer holding a trust account, a check drawn on that account, he is not in general bound to inquire whether that check is properly drawn. Here the customer has drawn no check, and the bankers seek to set off the balance of his private account against his credit on what they knew to be a trust account." It was very properly held that the set-off could not be allowed. The court would otherwise have permitted the bank to make a known misapplication of a trust fund.

So, in *Bodenham* v. *Hoskyns*, 13 E. L. & E. 222, Parks was the agent of Bodenham, and kept the moneys of his principal in the bank of Hoskyns, in a deposit account headed "Rotherwas account," and at the same time kept his own moneys in the same bank in a deposit account in his own name. After Parks was known to the banker to be insolvent, and when his private account was largely overdrawn, the bank, with the consent of Parks, transferred all the moneys standing to his credit on the "Rotherwas account" to his

credit on his private account, which still left that account over-drawn. The bank was very properly held to be a party to that breach of trust. The officers of the bank knew, at the time of the appropriation of the trust funds, that they were the funds of another entrusted to the care of their debtor, and that the debt to which they were applied was a strictly private debt, to which the trust funds could not properly be applied. The court says: "They were aware of the circumstances, which made it a fraud in Parks to make the transfer, * * * and they concur in the transaction." In the case at bar the officers had no knowledge or suspicion of the circumstances which made it a fraud in Waldron to pay these notes from the village funds.

In *Jandon* v. *City Bank et al.* 8 Blatch. 430, the trustee borrowed money from the bank for *his own use,* and pledged certificates of stock issued to him, as trustee for complainant, by name; and it was ruled that the bank held them for the complainant, the court saying: "The transaction of the loan indicated * * * that he was borrowing money for *his private use.*" In the case at bar the transaction of the loan did not indicate that he was borrowing the money for his own use. He professed to be borrowing for the use of Hyde Park, to pay warrants in anticipation of the collection of taxes.

It does not seem necessary to review other cases in detail. The teaching of all the authorities is consonant with the proposition that to charge a stranger as a party to the misappropriation of a trust fund, such stranger must knowingly partake in the breach of trust,—that he must know or have proof of facts which in law characterise the transaction as a breach of trust.

It is no doubt true that where a stranger receives moneys of a trust fund from the trustee as a gift, or without a valuable consideration, though in ignorance of the character of the moneys received, he may be held as a trustee; but

where such stranger to the trust has in good faith paid a valuable consideration, or has materially changed his condition, so that he can not be restored to his original advantages, that doctrine does not apply. In the case at bar the money was in good faith received by the bank from a man in good credit, and with assets in his hands of his own to the value of over $30,000, and his note and valuable collaterals were surrendered to him. It is now proposed, after that man has become insolvent, and has been stripped by complainant of all his assets, and has died, to rescind the payment to the bank, without restoring that for which it was paid. This, it seems to us, would be grossly unjust.

The judgment of the Appellate Court is therefore reversed, that the Appellate Court may reverse the decree and remand the cause to the circuit court, for proceedings not incompatible with the views of the law herein expressed.

*Judgment reversed.*

SCOTT and SHELDON, JJ., dissenting.

*Filed at Ottawa January 18, 1882—Rehearing denied March Term, 1882.*