HON. SILAS A. HOLCOMB, } JUDGES.
HON. SAMUEL H. SEDGWICK, }

DEPARTMENT NO. 1.
HON. WILLIAM G. HASTINGS,
HON. CHARLES S. LOBINGIER,*
HON. JOHN S. KIRKPATRICK,

DEPARTMENT NO. 2.
HON. JOHN B. BARNES,
HON. WILLIS D. OLDHAM,
HON. ROSCOE POUND,

COMMISSIONERS.

DEPARTMENT NO. 3.
HON. EDWARD R. DUFFIE,
HON. JOHN H. AMES,
HON. I. L. ALBERT,

---

STATE OF NEBRASKA V. OMAHA NATIONAL BANK ET AL.

FILED JANUARY 7, 1903. No. 11,795.

Commissioner's opinion, Department No. 1.

Conversion: INTENT. Where property has been taken from the plaintiff without his knowledge or consent or of those having the lawful custody and control over it, the motive which prompted

---

*Succeeded George A. Day, whose opinion in *State v. Omaha Nat. Bank* is the first filed during the term. Before the close of this term the commissioners were rearranged as follows:
Department 1—Hastings, Ames, Oldham.
Department 2—Barnes, Albert, Glanville (succeeded Lobingier).
Department 3—Duffie, Kirkpatrick, Pound.

the defendant to receive and dispose of it is an immaterial issue. But this rule does not apply when the plaintiff, his agent or servant, having the lawful custody or control over the property, consents to or requests the defendant to receive and dispose of it. In such case guilty intent is an essential element of conversion.

ERROR from the district court for Douglas county. Action for conversion of public funds by a depositary bank. Tried below before BAKER, J. Judgment for defendants. *Affirmed.*

Under the constitution of 1867, a large floating debt had accumulated against the state. Section 1 of article 12 of the constitution of 1875 forbade the contraction of a debt in excess of $100,000, with exceptions named, none of which concern the matter in hand; but it was impossible that this section could impair the obligation of an existing contract, because of a prohibition of clause 1, section 10, of article 1 of the constitution of the United States; and, too, the state constitution provided for the funding of outstanding warrants and other indebtedness of the state at a rate of interest not exceeding eight per cent. per annum.* To fund the floating debt, aforesaid, the legislature of 1877 passed an act authorizing the governor and secretary of state to issue lithograph coupon bonds to the amount of $566,369.38. These bonds were payable twenty years from April 1, 1877, with interest at eight per cent., payable semi-annually. They were issued with an option clause. See Session Laws, 1877, pp. 120-135, inclusive, and records of state treasurer's office. The liquidation of this indebtedness was provided for by a sinking fund; and in June, 1879, $200,000 of the principal was paid. On the 21st day of January, 1893, the Capital National Bank of Lincoln failed. At the time of such failure, said bank was a state depositary, and had on deposit $180,101.75 of the state sinking fund. The legislature of 1895 included in their current-appropriation bill an item

* Section 8, article 9.

State v. Omaha Nat. Bank.

for the last-named amount to reimburse the sinking fund for money "tied up" in the Capital National Bank. This was tantamount to transferring that amount of money from the general fund to the sinking fund; and the excuse given, at the time, for not making it the subject of a separate bill was that it had been forgotten till the constitutional period was passed. On the 10th day of April, the governor approved the bill including this item, under the impression that it was necessary to save the credit of the state. He was not advised of the fact that the state held these bonds to the last dollar, as an investment of the permanent school fund. On the same day that the item was approved the then treasurer presented a voucher therefor, upon which the warrant, set forth in the reply brief of the state, was issued. On the same day the state treasurer indorsed said warrant: "Presented and not paid for want of funds, and registered for payment Apr. 10, 1895. No. 27,932." Said warrant was, thereafter, indorsed by the state treasurer and delivered to the Chemical National Bank of New York, through the Omaha National Bank. In the year 1896 the Chemical National Bank sent said warrant to the Omaha National Bank for collection. On the 2d day of January, 1897, the treasurer drew his check for such warrant and accrued interest on the depositary fund in said bank, in the sum of $201,884.05. The latter bank was sued, as set forth in the opening statement of the case. —W. F. B.

*Constantine J. Smyth* and *Frank N. Prout, Attorneys General, Willis D. Oldham, Norris Brown, Ed P. Smith, Paul Pizey* and *William B. Rose,* for the state.

*Smyth, Attorney General,* and *Smith:*

The defendants below are liable, as a matter of law, on the ground that the payment by the state treasurer of public money to one claiming to be the owner, by purchase, of a warrant drawn on the general fund, "to reimburse the sinking fund," was unauthorized. *State v. Omaha Nat. Bank,* 59 Nebr., 483.

He who meddles with personal property which is not his own, must see to it that he is protected by the authority of one who is the owner or has authority to act, or he will, himself, be liable; and if he do an unlawful act, even at the command of another acting as principal, a liability will attach. *Cook. v. Monroe,* 45 Nebr., 349; *Stevenson v. Valentine,* 27 Nebr., 338.

In handling the state's money and conveying it to the Chemical National Bank, the defendants were not protected, either by authority of the state, or one having authority to act; hence their liability.

In an action for conversion, the motive which prompted the defendant is immaterial.

Everyone who aids and assists in the conversion, is liable. *Hill v. Campbell,* 54 Nebr., 59.

*John L. Webster, Richard S. Hall, I. H. McCullough, W. J. Connell* and *William C. Ives, contra.*

*Webster:*

The state presents this case on the theory that the good faith or innocence of the defendants is an immaterial issue in an action for conversion. While that may be true in some cases, it is not true where the plaintiff, its agent or servant, having lawful control over the property, consents to or requests the defendant to receive and dispose of it. Such is this case. In such case the defendants are not required to investigate the motive or intent with which the plaintiff's agent or servant is acting, and the defendants are not liable for conversion unless they knew there was an actual unauthorized disposal of the property. In such case guilty intent on part of defendants is an essential element of conversion.

It is a rule of law that an innocent person can not be held liable for a conversion, if his acts can be justified as having been in any manner authorized by the owner of the property.

A purchase, in good faith, from one who has no title and no right to transfer the property, will not constitute a

defense. Even an auctioneer or broker who sells property for one who has no title, and pays over to the principal the proceeds, with no knowledge of the defect of the title or want of authority, is held to be liable for its conversion to the real owner. *Williams v. Merle,* 11 Wend. [N. Y.], 80; *Hoffman v. Carow,* 20 Wend. [N. Y.], 21, 22 Wend. [N. Y.], 285; *Courtis v. Cane,* 32 Vt., 232. But this severe rule of law will not be applied when the act of appropriation can be justified as having been authorized in any manner by the owner of the property. Thus, when upon a conditional sale, the property is delivered and time given for a compliance with the condition, one who purchases and resells the property before the right to perfect the title, by such compliance, has been terminated, is not liable for a conversion to the general owner, who subsequently resumes his right to its possession. *Vincent v. Cornell,* 13 Pick. [Mass.], 294. When the owner has given to another, or permitted him to have, control of the property, no one can be held responsible in tort for its conversion who merely makes such use of the property, or exercises such dominion over it, as is warranted by the authority thus given. *Strickland v. Barrett,* 20 Pick. [Mass.], 415; *Burbank v. Crooker,* 7 Gray [Mass.], 158. See *Hills v. Snell,* 104 Mass., 173.

If defendants had read recitals in warrant, it would not prove they acted wrongfully or fraudulently.

*Prout, Attorney General, Brown* and *Rose,* in reply:

This is not an action of trover at common law, but an action for conversion under the Code. Counsel do not comprehend the nature of the case.

The warrant was prima-facie void. Its face impeached its validity. Here it is:

"$180,101.75          STATE OF NEBRASKA,          No. 95241.
          "OFFICE OF AUDITOR OF PUBLIC ACCOUNTS,
                    "LINCOLN, NEB., Apr. 10, 1895.
*"Treasurer of Nebraska,*
          "Pay to J. S. Bartley or order one hundred eighty thousand one hundred one and 75-100 dollars.

"For to reimburse state sinking fund.

"In accordance with legislative appropriation approved Apr. 10, 1895, and charge general fund.

"Countersigned:                         EUGENE MOORE,
    "J. S. BARTLEY,               *Auditor Public Accounts.*
     "*State Treasurer.*          P. O. HEDLUND, *Deputy.*
    "...... ......, *Deputy.*"

Under the title, "An act making appropriation for current expenses of the state government * * * and to pay miscellaneous items of indebtedness owing by the state," the insertion of an item to reimburse the state sinking fund is a violation of the constitutional provision forbidding legislation on a subject not within the title of the act, and a state warrant for the amount of such an item is absolutely void.

The intention to appropriate "sums out of any money in the treasury" and the passage of an act for that purpose alone, show conclusively that the legislature did not intend by the same act to increase the funds in the treasury by borrowing money on a warrant.

A state warrant issued for the purpose of borrowing money to reimburse the sinking fund to the extent of $180,101.75 by a sale of such warrant is void because the creation of such a debt is inhibited by section 1, article 12, of the constitution, which denies to the state the power to contract a debt in excess of $100,000.

Under the express provisions of this act, no warrant could be legally issued to J. S. Bartley for $180,101.75.

DAY, C.

This case was before this court upon a former hearing, being reported in 59 Nebr., 483, wherein the judgment of the district court, based upon a verdict for the defendants, returned in obedience to the peremptory direction of the court, was reversed and remanded. A retrial resulted in a verdict and judgment for the defendants, to review which the state has brought the case on error to this court. Upon the former hearing the present chief justice* took no part;

* NORVAL was chief justice when this opinion was written.

Justice HARRISON joined in the reversal, but expressly stated he did not concur in the reasons for reversal announced in the opinion of Justice SULLIVAN. It is for these reasons we are asked to again examine some of the questions previously considered by the court.

This action was brought by the state of Nebraska in the district court of Douglas county against the Omaha National Bank and J. H. Millard, president, to recover $201,-884.05, with interest thereon from January 2, 1897. The basis of the state's claim is an alleged conversion by the defendants of said money, which, it was claimed, was paid to them on a check given by J. S. Bartley, state treasurer, and which it is charged they illegally, wrongfully, fraudulently and without authority of law converted to their own use. A brief history of the transaction may serve to enlighten the discussion.

In January, 1893, the Capital National Bank of Lincoln failed, having at the time on deposit to the credit of the state $180,101.75, belonging to the sinking fund. For the purpose of reimbursing that fund out of the general fund, the legislature of 1895 passed an appropriation act, approved April 10, 1895, entitled "An act making appro-. priation for current expenses of the state government for the years ending March 31, 1896, and March 31, 1897, and to pay the miscellaneous items of indebtedness owing by the state of Nebraska." Session Laws, 1895, p. 386. Among the items for which appropriation was made was one as follows: "For state sinking fund, one hundred eighty thousand and one hundred and one and seventy-five 'one-hundredths ($180,101.75) dollars, to reimburse said fund for same amount tied up in Capital National Bank."

On April 10, 1895, J. S. Bartley, state treasurer, filed with the auditor of public accounts a claim for the entire amount, which was examined and adjusted by the auditor and approved by the secretary of state, as provided by law, and a warrant for said amount was made out and delivered to him in words and figures as follows:

"$180,101.75          STATE OF NEBRASKA,          No. 95241.
    "OFFICE OF AUDITOR OF PUBLIC ACCOUNTS,
                    "LINCOLN, NEB., Apr. 10, 1895.

*"Treasurer of Nebraska,*

    "Pay to J. S. Bartley or order one hundred eighty thousand one hundred one and 75-100 dollars.

    "For to reimburse state sinking fund.

    "In accordance with legislative appropriation approved Apr. 10, 1895, and charge general fund.

    "Countersigned:                    EUGENE MOORE,
        "J. S. BARTLEY,          *Auditor Public Accounts.*
        *"State Treasurer.*          P. O. HEDLUND, *Deputy.*
    ".... ....., *Deputy."*

This warrant was indorsed upon the back thereof as follows: "Presented and not paid for want of funds, and registered for payment Apr. 10, 1895. Number 27932. J. S. Bartley, State Treasurer, Lincoln, Nebraska." And also the further indorsement of the names: "J. S. Bartley" and "J. H. Millard, Pt."

Soon after the issuance of this warrant, Bartley sold it to the Chemical National Bank of New York. In October or November, 1896, the Chemical National Bank, claiming to be the owner of the warrant, forwarded it in the usual course of business to the defendant bank for collection.

    On January 2, 1897, and for a long time prior thereto, the defendant bank was a state depositary, and on that date had on deposit to the credit of the general fund of the state, in the name of J. S. Bartley, state treasurer, a sum of money largely in excess of the amount of the check hereinafter described. On said day, J. S. Bartley, as state treasurer, called at the Omaha National Bank and drew his check, payable to the order of J. H. Millard, Pt., for the sum of $201,884.05, against the funds standing to his credit in said bank as state treasurer, and delivered the same to William Wallace, the cashier of said bank, in payment of the warrant heretofore described, together with the accumulated interest thereon. As a part of the transaction, Bartley directed the officers of the defendant bank

to apply the check in payment of the warrant. The warrant was thereupon surrendered to Bartley, state treasurer; his account as treasurer was charged with the amount of the check; the Chemical National Bank was credited with the sum of $198,253.65, and the balance, $3,630.40, was credited to the Exchange National Bank. These credits were given pursuant to the direction of Bartley, state treasurer, and the Chemical National Bank. The entire amount to the credit of the Chemical National Bank was drawn out of defendant bank in the usual course of business before the 14th of January, 1897, long before the commencement of this suit, and long before any demand for the money had been made.

While the check by its terms was made payable to "J. H. Millard, Pt.," it was not delivered to him or indorsed by him in his individual or official capacity; nor did he, in fact, receive any money or credit for the check. It was intended by Bartley, and treated by the parties to it, as a check to the defendant bank in payment of the warrant. It was shown that it was the custom of business among banks where checks were made payable to its officers to treat them as being made to the bank. Aside from being named as the nominal payee therein, Millard was a stranger to the transaction.

The rule is well settled that a check made payable to an officer of a bank in his official capacity is to be treated as though made payable to the institution which he represents, where it appears that the maker does not intend that the payee shall be a party to it or indorse it to give it effect. The intention of the parties controls. *Nave v. First Nat. Bank,* 87 Ind., 204; *Garton v. Union City Nat. Bank,* 34 Mich., 279; *Bank of New York v. Muskingum Bank,* 29 N. Y., 619; *Baldwin v. Bank of Newbury,* 1 Wall. [68 U. S.], 234, 17 L. Ed., 534.

At the close of the testimony the attorney general, for the state, moved the court for a peremptory instruction to the jury to return a verdict for the plaintiff against the defendants, which motion was overruled. Thereupon the

61

plaintiff moved the court for an instruction to return a verdict in favor of the plaintiff and against the defendant bank and in favor of the defendant Millard. This motion was likewise overruled. The ruling of the court upon these two motions presents the principal grounds of error now complained of by the state. In our opinion, the facts, so far as they relate to the defendant Millard, do not establish a cause of action. There is nothing in the record which even tends to show that the acts of Millard were other than as officer and agent of the defendant bank. The proofs are lacking which go to establish an action in conversion against the defendant Millard, and for that reason the ruling of the court upon plaintiff's motion for an instruction for a verdict against both defendants, was properly overruled.

The purpose of the legislature in passing the enactment above referred to was to transfer the state's money from the general fund to the sinking fund. The question naturally arises as to the proper method to be pursued in accomplishing that object. Section 22 of article 3 of the constitution provides as follows: "No money shall be drawn from the treasury except in pursuance of a specific appropriation made by law, and on the presentation of a warrant issued by the auditor thereon."

Sections 1 and 2 of chapter 93 of the Compiled Statutes of 1899* provide that the treasurer of the state shall keep a warrant register, in which he shall register for payment all warrants presented to him, the warrants to be numbered consecutively, giving the date of their presentation, the name of the holder; and that they be paid in the order of their presentation.

Under the provisions of this appropriation act it was entirely proper for Bartley, as state treasurer, to receive from the auditor of state the said warrant, and, when received, to present and register it for payment in the same manner as any other warrant drawn upon the general fund. The fact that the money arising from this appropriation was to reimburse one of the state's funds would give the

* Cobbey's Annotated Statutes, secs. 10850, 10851.

state no greater rights in the manner of its withdrawal than it would have in the payment of any other liability. The obligations of the state and the salaries of its officers are paid by the issuance of a warrant drawn upon the general fund. These are presented for payment and registered, and in due course of business are called in and paid. What right has the state, under existing laws, to appropriate money to its use out of the general fund and have it paid ahead of registered warrants? Our law does not recognize preferred claims as to the order of payment.

.The fact, however, that Bartley had the right to receive the warrant, conferred upon him no authority to dispose of it. He was a mere trustee. In our view, he should have held it, when registered, until in the regular course of business it was called in for payment, then paid it and credited the sinking fund with the amount of the warrant and interest and charged the general fund with a like amount. This is not only the logical way of transferring money of the state from one fund to another, but is in compliance with the forms of law and in harmony with the system of accounts adopted by the state. If the warrant was properly issued, it was perfectly legitimate that it should be paid by a check drawn by the treasurer upon money belonging to the general fund of the state in the hands of its depositary. The defendant bank, as before stated, was a state depositary. The depositary law provides as follows: "All such deposits shall be subject to payment when demanded by the state treasurer on his check." It also requires that the depositary bank must give bond "for the payment of said deposit * * * when demanded by the state treasurer on his check at any time."* It is conceded by the state that the defendant bank, in the payment of the check, violated no duty it owed to the state as custodian of the public funds. The unlawful act upon which this suit is grounded is not the payment of the state's money on the Bartley check, nor for the sale of the warrant, but in receiving the money as agent for the

* Compiled Statutes, ch. 83, art. 13, secs. 3a, 3c; Cobbey's Annotated Statutes, secs. 10865, 10867.

Chemical National Bank, and its application in payment of the warrant. It being the legal duty of the state treasurer to pay the obligations of the state, represented by warrants, it would seem that the defendant bank ought to be protected in receiving the money from him and applying it in payment of the warrant, unless it had notice or knowledge that he was using the state's funds for unlawful purposes.

It is one of the contentions of the state that the recital in the warrant, "For to reimburse state sinking fund," was a sufficient notice to the defendants that the warrant was not a state obligation, and was sufficient to apprise them of its unlawful character. While the recital in the warrant might be prima-facie notice of the purposes for which it was given, and of its illegal character in the hands of any one but the state or its trustee, the testimony discloses that neither the defendant bank nor its officials read the warrant and had no knowledge of the recitals contained therein. In general form and appearance it was like all other warrants issued by the state, was signed by proper officials and purported on its face to have been issued by authority of law. The only thing to distinguish it was the words, written in black ink upon a blank line, "For to reimburse state sinking fund." Upon the back of the warrant there is indorsed the name "J. H. Millard, Pt."; but the testimony is clear that this indorsement was not upon the warrant at the time of its payment, nor was the indorsement in the handwriting of J. H. Millard, nor was it placed thereon with his knowledge or direction. When the case was before this court upon a former hearing, it was reversed upon the theory that the question of notice or knowledge on the part of the defendants of infirmities in the warrant was proper to be submitted to a jury. This was done upon the last trial and the jury found for the defendants. The finding of the jury on the question of notice or knowledge of the illegal character of the warrant is conclusive upon this court.

It is also contended by the state that in an action of con-

version, the motive which prompts a person to receive, dispose of or appropriate property to his own use is entirely immaterial, where the property has been taken without the knowledge or consent of the owner; and the case of *Cook v. Monroe,* 45 Nebr., 349, and kindred cases are cited in support of this contention. The theory upon which the cases cited proceeds is that the moving party was an intermeddler, acting without real or apparent authority.

While the rule in *Cook v. Monroe, supra,* is correct in the abstract, it has no application to a case where the act of conversion can be justified, as having been in any manner authorized by the owner of the property or his agent or servant having the lawful custody and control over it. No one would contend that if the owner of property delivered it to a person and requested him to dispose of it in a prescribed manner and the request was complied with, an action of conversion would lie against such person; and the same principle of law applies where the duly empowered and lawful agent, having the control and possession of the property, makes the request and gives the direction. The state treasurer was the lawful custodian of the state's funds; he was the duly elected and qualified agent of the state; he was authorized to draw checks and to pay the state's warrants; he directed the proceeds of the check to be applied in payment of the warrant; and in pursuance of his request, the payment was so applied. The treasurer, in doing this, acted within the apparent scope of his authority; and the defendant bank, in following his direction, is protected, unless it had notice or knowledge that a breach of trust was being committed by the treasurer by an improper application of the state's funds in payment of a warrant which was not a valid obligation of the state.

In *Hills v. Snell,* 104 Mass., 173, 177, 6 Am. Rep., 216, 219, the distinction we have made is recognized and stated as follows: "A purchase, in good faith, from one who has no title and no right to transfer the property, will not constitute a defense. Even an auctioneer or broker who

sells property for one who has no title, and pays over to his principal the proceeds, with no knowledge of the defect of the title or want of authority, is held to be liable for its conversion to the real owner. * * * But this severe rule of law will not be applied when the act of appropriation can be justified as having been authorized in any manner by the owner of the property."

In *Tousley v. Board of Education*, 39 Minn., 419, it is said in the syllabus: "An act for conversion will not lie when the taking and conversion of the property is with the knowledge and consent of the plaintiff." *Union Stock Yard and Transit Co. v. Mallory*, 157 Ill., 554.

The record also shows that the payment of the warrant to the defendant bank was made in the usual course of business and the proceeds thereof transmitted to the Chemical National Bank before any claim was made by the state or any knowledge brought to the bank or any of its officers that the warrant was not a valid obligation of the state in the hands of the holder. While the payment of the check and the credit to the Chemical National Bank was a mere matter of bookkeeping, the practical effect of the transaction was the same as though the money had been paid over to Bartley upon the check, and he in turn had paid it to the bank in payment of the warrant and the bank had paid it over to the Chemical National Bank. *Bartley v. State*, 53 Nebr., 310. The rule is well established that where, in due course of business, money is transferred to an honest taker who receives it without any knowledge of wrong doing on the part of the payor, he would acquire a good title thereto as against the true owner.

*Jones v. Nellis*, 41 Ill., 482, was an action in trover to recover the value of certain government bonds which had been stolen from the plaintiff and bought by the defendant for a valuable consideration in the due course of business without knowledge that it was stolen property. The court says: "The rule is well settled, at common law, that the bona-fide holder of money or negotiable paper, transferable

by mere delivery and not overdue, who has taken it in the
usual course of business, and for a valuable consideration,
acquires a perfect title. * * * This exception to the
common-law rule, that the purchaser of a chattel can ac-
quire no better title than the vendor had, has been adopted
because, in the language of Lord Kenyon, in *Lawson v.
Weston,* 4 Esp. [Eng.], 56, the contrary principle 'would
at once paralyze the circulation of all paper in the country,
and with it all its commerce.' " *Merchants' Loan & Trust
Co. v. Lamson,* 90 Ill. App., 18; *Miller v. Race,* 1 Burr.
[Eng.], 452; *Holly v. Domestic & Foreign Missionary So-
ciety,* 34 C. C. A., 649, 92 Fed. Rep., 745; *Merchants' Ins.
Co. v. Abbott,* 131 Mass., 397; *Stephens v. Board of Educa-
tion,* 79 N. Y., 183; *Hatch v. Fourth Nat. Bank,* 41 N. E.
Rep. [N. Y.], 403.

So far, we have considered the case on the theory that
the warrant was valid and the issuance of it constituted
the proper method of transferring the money from the
general fund to the sinking fund. But the result would be
the same if the warrant be regarded as not properly issued.
The fact remains that the state by its officers adopted that
method of making the transfer. The facts are undisputed
that the defendants had no actual notice or knowledge of
the purpose for which the warrant was drawn, and as they
had no notice of the recitals on the face of the warrant, but
paid the check, and applied the money by the direction of
the state treasurer in the utmost good faith, they are pro-
tected from liability. This was evidently the theory upon
which Judge SULLIVAN proceeded in the former opinion, for
in it he recognizes the importance of good faith on the part
of the defendants, and held that knowledge on the part of
the defendants as to infirmities in the warrant was a
proper question to be submitted to the jury. It would,
doubtless, be different had the defendants known of the
purpose for which the warrant was given. The theory
upon which the case was tried in the court below, involved
the question of notice or knowledge on the part of the de-
fendants of the unlawful purpose to which the state's

funds were being applied. The testimony was clear and undisputed that the bank officials did not read the warrant. Its general form and appearance was like other warrants issued by the state. It was signed by proper officers and purported to be a state obligation. In our opinion the question of good faith on the part of the defendants was a proper one to be submitted to the jury. It follows from this discussion that it was not error to overrule the state's motion for a peremptory instruction to the jury for a verdict for the state and against the defendant bank and in favor of defendant Millard.

We have examined the other errors complained of by the state, but as it was conceded that the principal ground relied upon was the overruling of the motion for a verdict heretofore considered, we will not prolong this opinion. They are not meritorious.

It is therefore recommended that the judgment of the district court be affirmed.

KIRKPATRICK, C., took no part.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is

AFFIRMED.

SEDGWICK, J. .

I agree to the conclusion reached by the commissioner and to much of the reasoning employed, but think it proper to suggest some further reasons for the decision entered.

It is said by the commissioner that the evidence shows that the officers of the defendant bank did not read the warrant and had no knowledge of its contents. Of course, one who purchases paper will not be allowed to shut his eyes as to its contents, and then say that he is a bona-fide purchaser; and so one who is interested in the purchase of real estate can not accept his deed and avail himself of it provisions, and at the same time say that he was not aware of its contents, but there may be some ground for saying that the rule is different in a case of this kind.

If a servant is given a check, and sent to a bank to obtain the funds thereon for the drawer of the check, he is not bound to examine the contents of the check, and will not be presumed to have interested himself therein; and in an action against the drawer for fraud or other tort in connection with the check, the servant being joined as assisting him in so doing, it may be doubtful whether the servant would be presumed to know the contents of the check.

It is insisted that the defendants' relation to the warrant in question was that of a disinterested party having no occasion to take notice of its contents. However this may be, it seems to me that if it be found that the defendants are chargeable with notice of the contents of the warrant, we should inquire further as to what are the facts so brought to the knowledge of the defendants. They were without doubt bound to take notice of the act of the legislature referred to in the warrant, and must then be presumed to have known of the deficiency in the sinking fund caused by the failure of the Capital National Bank, and of the purpose and object of the legislature to replenish that fund from the general fund of the state, and that the legislation was somewhat incomplete, so that the procedure intended by the legislature was uncertain, and that the officers of the state, the auditor, secretary of state, and treasurer, had adopted the method of presenting a claim in the name of the treasurer and issuing a state warrant thereon for the amount to be transferred to the sinking fund. If this procedure was unwarranted by the act of the legislature, the warrant would not be a valid obligation of the state, and would not be the property of the state, since it had none of the characteristics of property, and would constitute nothing more than a memorandum of certain steps of the method of procedure that had been adopted by the officers of the state. It would not, of course, be commercial paper. If this paper had been sold by Bartley to the Chemical National Bank and was held by that bank, the presumption would be that Bartley had received the money therefor; and the question would then

be, what would these facts suggest to innocent parties handling the paper for another, but without any beneficial interest in it themselves? No doubt a state treasurer is in a sense the agent of the state, but his relation to the state is somewhat different from that of an ordinary agent to his principal. It is conceded by the attorneys for the state that the defendants acted in perfect good faith in the matter and had no actual notice of any intentional fraud. Ordinarily an innocent party handling papers for a trustee, if questions arise in his mind as to the propriety of the actions of the trustee, may account for the funds under his control to the principal, and so relieve himself of any doubt as to the authority of the agent; but the state treasurer is in a sense the principal, also, in his dealings with innocent parties. In many respects he stands for the state. No payment could be made to the state except through him, and any withholding of the funds of the state from the treasurer would be a withholding of the funds from the state itself. There is nothing in the record to show that at that time there was anything to indicate to any one that there was any default on the part of the state treasurer, or that the funds of the state were in any jeopardy. It has since transpired that Bartley was a defaulter. But the defendants acted in view of conditions as they then appeared. No one then, so far as the record shows, had any information in regard to the condition of the treasury that would suggest to the most prudent that there was any occasion for unusual caution. It is a mistake to suppose that this warrant shows on its face that the fund was claimed by Bartley individually. The fact that the payee in the warrant was J. S. Bartley must be construed in connection with the fact that the warrant was signed by J. S. Bartley as treasurer, and the recital in the warrant itself that the money was to be paid to J. S. Bartley to reimburse the state sinking fund, is conclusive upon all parties that the warrant was drawn for the benefit of the state, and that funds transferred in accordance with the terms of the warrant were transferred for the benefit

of the state, and must be so considered by the payee, as well as by the officers of the state who indorsed the proceeding. No one would insist that money that Bartley might obtain on this warrant would be any less the money of the state than if the word "treasurer" had immediately followed his name as payee in the warrant. Payment, then, to Bartley, on account of this warrant, would be payment to the state; and the defendants, when this warrant came to them from the Chemical National Bank, would be justified in supposing that the amount of the warrant had been, by the Chemical National Bank, advanced to the state, so that, through the method adopted by the state officers in mistaken construction of an imperfect and uncertain act of the legislature, the money represented by the void warrant had been actually obtained from the Chemical National Bank and transferred to the state sinking fund, and the Chemical National Bank presents this void warrant to the state treasurer and asks that the money that the bank had advanced to the state, and the amount of which was then in the general fund, should be paid to it by the treasurer out of that fund, thus completing the transfer in accordance with the method adopted by the state. If the facts, then, were as the defendants were justified in supposing them to be, this warrant, although void when the Chemical National Bank advanced the money thereon to the state, did in fact, after the money had accumulated in the general fund with which to redeem it, represent the amount in the general fund which equitably belonged to the Chemical National Bank. The defendants, at the request of the Chemical National Bank, presented this warrant to the treasurer. They had no interest in the transaction. The law required them to pay the money of the state on the check of the treasurer. It was the province of the treasurer to determine the form and regularity of the proceedings.

There is no doubt that "in an action for conversion the motive which prompted the defendant to dispose of, or appropriate to his own use, the property of plaintiff, is an

immaterial issue." *Hill v. Campbell Commission Co.*, 54 Nebr., 59. That is, if the defendant is guilty of a conversion of the plaintiff's property, it can make no difference what his motive was in so doing; he is liable to the plaintiff for the value of the property. But one who disposes of the property of another under directions of the owner or under the direction of the owner's agent or trustee, who is in control of the property, is not guilty in law of a conversion of the property, unless he has notice at the time that the agent or trustee, so in control of the property, is converting it to his own use.

In *Fifth Nat. Bank v. Hyde Park*, 101 Ill., 595, a village treasurer borrowed money from the bank on his own note with his own securities as collateral. He represented to the bank that he was making the loan for the village and the money was deposited in the bank to his credit as treasurer. The most of the money was paid out on village warrants, and after the taxes had been collected the treasurer drew his check as treasurer to pay his individual note and to redeem his collateral. It was afterwards ascertained that the treasurer was a defaulter, and the bank was sued to recover the amount of money for which the treasurer had drawn his check in payment of his own personal note, and it was held that the bank was not liable. The court said (page 603) : "In Morse, Banks and Banking, 37, it is said, in general terms: 'If a depositor seeks to pay his own debt to the banker by an appropriation of the funds to his credit in a fiduciary capacity, then the banker is affected with knowledge of the unlawful character of the appropriation, and will be compelled to refund.' It seems plain, however, that unless the debt to which the funds are thus applied be such that the officers of the bank are aware that the same is really and in truth 'his own debt,' knowledge of the unlawful character of the appropriation can not be imputed to the bank. To charge a stranger to a trust fund as a trustee, by reason of participation in a misapplication of the fund, upon the ground that the fund was used in payment of a private debt of the original

trustee, it is necessary to show not only that the party sought to be charged was aware that the fund was a trust fund, but also that he was aware that the debt to the payment of which it was applied, was, at the time of such application, in fact a private debt,—a debt of such character that the fund in question could not lawfully be applied in payment thereof." And the court also quoted from *Keane v. Robarts,* 4 Maddock, Ch. [Eng.], 332, 357: "Generally speaking, he does become a party to the breach of trust, by buying or receiving in pledge any part of the personal assets, not for money advanced at the time, but in satisfaction of his private debt, because this sale or pledge is *prima facie* inconsistent with the duty of an executor." The court said: "This implies that the debt in satisfaction of which the property is taken, is of such character that it is known to be a private debt, for it is elsewhere declared that the party so receiving the trust fund must, to become chargeable, have been guilty of 'fraud, collusion or gross negligence.' In the same case the vice-chancellor says [at page 358]: 'If a party dealing with an executor for the personal assets pays his money to the executor, so that it may be applied to the purposes of the will, he is not responsible for the executor's misapplication of it; but if, in dealing with the executor, he does in truth pay his money for the private purposes of the executor, he is equally a party to the breach of trust, whether he applies his money to the private debt of the executor, or to the private trade of the executor, and this because be knows that the object to which the money is applied is not an object to which it may be lawfully applied.' " The court further said (p. 605): "In *Field v. Schieffelin,* 7 Johns. Ch. [N. Y.], 150, Chancellor Kent says, in substance, that to charge a third party with participation in the misapplication of trust funds by a trustee, the proof must 'justify the conclusion of a breach of trust, in which the party to be charged knowingly partook.' That was the case of a guardian, and Kent, after a review of all the then cases, says they all agree that a party dealing with

an executor is safe if he is no party to this fraud, and has no knowledge or proof that he intended. to misapply the proceeds, and was not in fact by the very transaction applying them to the extinguishment of his own private debt. This necessarily refers to a debt known to be his own debt, to which the fund could not be properly applied. We have examined with care all the cases referred to by counsel for appellee, and many others, where a party receiving trust funds in payment of a private debt to himself has been held chargeable as a trustee, and we find no case among them where the party so charged was not aware, at the time of receiving such trust funds, that the debt to which it was applied was a debt to the payment of which the trustee could not lawfully apply the trust fund. The receipt of such money, under such circumstances, is a plain fraud. * * * It follows that, under the circumstances, at the time when the officers of this bank received payment of this loan, they were not aware that, as between the village of Hyde Park and Waldron, he had not lawfully and equitably the right to apply the public funds to the payment of this debt. They must be assumed to have known the law in relation to the transaction, but the law does not impute to them omniscience as to the facts. Taking the facts as these officers believed they were, and as they had good cause to believe, the payment would not have been a misappropriation of the funds. They are not chargeable with fraud, collusion, or gross negligence."

Ordinarily, if a trustee deposits his funds with a third person and afterwards calls upon that third person for the funds, the party who has the funds is not bound to make inquiries as to the purpose for which the trustee intends to use the funds; and if he knows the purpose for which he intends to use them and it can in any view of the case be a legitimate and proper use of the funds, he can not withhold the same from the party who had deposited them with him. Nor is he bound to presume that the purpose is an unlawful one. To defendants it appeared that, when Bartley found that the warrant had been forwarded by the Chemi-

cal National Bank, he determined to pay to that bank the money which it had advanced to the state as represented by the warrant. It is not claimed by any one that the defendants took any part in determining that question, or in any way influenced its determination. If it was the duty of the defendants to prevent this action, the duty would have been the same if the treasurer had presented his check and demanded the money; they knowing that he intended to use the money to reimburse the Chemical National Bank. A state depositary has no supervisory control over the state treasurer. On the other hand, it is but an instrument in his hands, placed by the law absolutely under his control, so far as the possession of the state funds is concerned, bound by its bond to pay the money upon demand upon the check of the treasurer; he in turn being bound by his bond to properly control the funds.

Being justified in supposing that the money in fact belonged to the Chemical National Bank, and knowing that it was intended by the treasurer to pay it to that bank upon a warrant issued by the state officers for that purpose, it can not be said that the circumstances were such as to allow of no other belief on the part of the defendants than that Bartley, in so doing, was converting the money to his own use.

HOLCOMB, J., concurring.

Until the commencement of the September term of court, I had hoped the case at bar could be decided without participation, on my part, in the decision rendered. My disinclination to sit in the cause arises from the fact that as governor of the state I formally authorized the attorney general to institute any and all legal proceedings his judgment approved of, which seemed advisable and required, in order that the state should recover its dues by reason of a shortage in the accounts of its former state treasurer, Joseph S. Bartley, which was discovered to exist at the time of the expiration of his term of office as such treasurer; and I was also cognizant of the institution

of the present action against the defendants herein under
the general authority thus given the attorney gen-
eral. Since it has become apparent that I must
act if a decision is rendered in the case, I have
devoted some attention to the proposition of whether
a legal disqualification as to my participating in a decision
existed, and if so, to make formal declaration of the con-
clusion reached in respect thereof, thus leaving a decision
of the appeal of the state to my two associates, and if they
could not agree, to allow it to await the passing of time
until by changes in the personnel of the court a decision
could be reached by an agreement of at least two members
of the court, which the constitution requires in order to
render a valid judgment of affirmance of the judgment of
the trial court or a reversal thereof.

The defendants have challenged my qualifications to
take part in a decision of the case, not in the proceedings
now pending, but in a branch of this same case heretofore
before the court. *State v. Omaha Nat. Bank,* 60 Nebr.,
232. It is quite obvious that if in the collateral
proceedings valid objections existed to my taking part in
the deliberations of the court on the questions therein
presented for adjudication, such objections apply with
much greater force in a decision of the controversy inci-
dent to a trial of the main issues. The alleged disqualifica-
tion is grounded on the assertion that, while acting as
governor, in the performance of my official duties as such,
I inquired into the facts in the case at bar and formed the
opinion that the state was entitled to recover from the de-
fendants the amount sued for, and directed the attorney
general to bring this action. The ground of objection is
stated broader than the facts warrant, all of which appear
in the record of the proceedings last referred to. The au-
thority to the attorney general was general, authorizing
and requesting that he bring such action or actions as
would in his judgment conserve the interests of the state
and conduce to a recovery of the moneys due it by reason of
the defalcation of its state treasurer. I was cognizant of

the fact that the action now here for review was begun for the purpose of recovering a portion of the moneys lost to the state and that such action was based on the theory that a conversion of that much money belonging to the state had taken place, and that the attorney general had examined into the facts and in his opinion the defendants were liable; that the suit was in its general characteristics an action for conversion. Personally I was not acquainted with the facts connected with the transaction out of which the alleged liability grew, except certain prominent and patent facts connected therewith which were known of all men. I did not act as counsel with the attorney general or make a personal investigation of the law and the facts which must ultimately determine the defendants' liability. The examination of the record now presented for review is my first intimate acquaintance with the details of the transaction as disclosed therefrom. I have heretofore entertained no settled convictions either as to all the facts on which the alleged liability of defendants rests or the law applicable thereto and the proper legal deductions to be drawn therefrom. Save my former relation to and connection with the case of the purely official character mentioned, and which was occasioned by my occupying at the time the office of governor, I have not otherwise been identified in any manner with the action; and if excused from participating in a decision of the questions presented, which I would greatly prefer to be, it must rest on the sole proposition that the general authorization given the attorney general to institute such actions as seemed necessary and knowledge that this action was being prosecuted to fix liability on the defendants, constitutes a legal disqualifying cause.

The only statute law we have on the subject is found in section 37,* chapter 19, entitled "Courts—Supreme and District." It is there provided: "A judge or justice is disqualified from acting as such, except by mutual consent of parties, in any case wherein he is a party, or interested, or

* Cobbey's Annotated Statutes, sec. 4747.

where he is related to either party by consanguinity or affinity within the fourth degree, or where he has been attorney for either party in the action or proceeding, and such mutual consent must be in writing and made a part of the record." Assuming that the statutory provision just quoted applies to a member of the supreme court, which I do for my present purposes, it will be observed that three grounds of disqualification are recognized, any one of which, if existing, would preclude a judge from participating in a decision of the cause. First, in any case wherein he is a party or is interested; second, where he is related to either party within the fourth degree; and third, where he has been an attorney for either party in the action or proceeding. In applying the principle of disqualification of a judge by reason of the common-law rule, or statutory or constitutional provisions such as have been noted, it has been a rule of the courts to give such provisions a liberal rather than a narrow and technical construction and to apply them to all classes of cases and to all judicial officers. *State v. Hocker,** 25 L. R. A. [Fla.], 114; *Hall v. Thayer,* 105 Mass., 219; *Curtis v. Wilcox,* 74 Mich., 69. With this rule of construction I am entirely satisfied, and believe it to express a sound principle of law. By the common law the only ground of disqualification recognized was that of a direct interest in the subject-matter of litigation and this was based on the fundamental principle that "It is against reason, that if wrong be done any man, that he thereof should be his own judge." Coke on Litt., sec. 212. This ground of disqualification contemplated a pecuniary interest,—a legal interest in the result of the action. *Sjoberg v. Nordin,* 26 Minn., 501. The objection that the judge had been of counsel or was related to a party to the action was not recognized as a disqualifying clause by the common law; for, as it is said, "The law will not suppose a possibility of bias or favor in a judge, who is already sworn to administer impartial justice." 3 Blackstone, Commentaries, 361 and note 64; *Townsend v.*

---

* 15 So. Rep., 581; 34 Fla., 25.

*Hughes,* 2 Mod. [Eng.], 150; *Russell v. Belcher,* 76 Me., 501; 12 Am. & Eng. Ency. Law, 41. This may have been and probably was a violent presumption, and not in accord with modern ideas nor in consonance with our more refined views as to the proprieties which should be observed in the administration of justice. Because of a more enlightened view and to the end that "evil appearances should be avoided that the fountain of justice may be kept pure," constitutional and statutory provisions have been added which, in this state, not only will not allow a judge to try his own case, but also disqualify him on account of relationship and where he has been of counsel for one of the parties in the action. Where a legal disqualification does exist and the judge by reason thereof is prohibited from sitting in the trial of the case, a judgment rendered by him in such a case is generally held to be void. *Wigand v. Dejonge,* 8 Abb. N. Cas. [N. Y.], 260; *Franco-Texan Land Co. v. Howe,* 3 Tex. Civ. App., 315; *Fechheimer v. Washington,* 77 Ind., 366; *Chicago & A. R. Co. v. Summers,*\* 113 Ind., 10; *Bailey v. Kimbrough,* 37 Mo., 182; *Reams v. Kearns,* 5 Coldw. [Tenn.], 217; *Newcome v. Light,* 58 Tex., 141, 44 Am. Rep., 604.

If a disqualifying cause as to myself in the case at bar exists, it must arise by an application of the principle underlying the rule to the effect that a judge is disqualified from deciding a cause in which he has been an attorney or of counsel for one of the parties to the action. This principle can be invoked only on the theory that as governor I examined into the facts and the law of the case as an attorney ordinarily would do before bringing an action, formed an opinion as to the liability of the defendants and thereupon directed the attorney general to institute the proceedings by which the defendants are sought to be held liable for a part of the moneys due from the ex-treasurer to the state. This, however, is an erroneous conception of the true condition of affairs. As governor, when I was informed of the fact that the ex-treasurer had defaulted, I

---

\* 3 Am. St. Rep., 616.

became concerned as to the enforcement of the law with respect thereto, and that all proper legal steps should be taken to protect the state's interest and recover the moneys due it. The attorney general, as the law officer of the state, was given charge of the matter and authorized to investigate the facts and bring such action or actions as seemed to be required to accomplish the desired object. The executive was not called upon to determine the liability of any one against whom an action might be brought to recover all or any part of the moneys which the state had lost. This duty devolved upon the attorney general, as the state's chief law officer, by a resort to the courts. The executive might have been a layman, without any special knowledge or legal attainments by which to judge as to the liability of any against whom a recovery was sought. The relationship of attorney and client, as between the state and myself, or of cocounsel, as between the chief executive and the attorney general, was not created, nor did it exist in the remotest degree, nor did I assume in the slightest to act the role of an attorney in the case. The action actually taken would be more analogous to that of a judge, who might instruct the proper prosecuting officer to file an information against one charged with having violated the law, or begin proceedings regarding a matter of public importance, and yet by reason thereof it would not, I apprehend, be seriously urged that because such action had been directed by a judge, he was thereby disqualified from trying the case brought as a result of such direction.

By the constitution the supreme court is composed of three members, two of whom must concur before a valid judgment can be rendered. No provisions are made by which a cause can be decided save in the one manner stated. A judge can not, as I conceive the law to be, when qualified, excuse himself from participating in a decision, where such action is necessary in order that parties to a case may have their cause decided when brought to this court, as contemplated by the constitution. Even though the duty may be an unpleasant one, it must nevertheless

be discharged, if no legal disqualification exists. As is said in *Reed v. State*, 11 Tex. App., 587, nor can a judge excuse himself unless a legal disqualification exists nor escape the discharge of a duty devolving upon him in his official capacity. From considerations of the character heretofore commented upon and an examination of many authorities, I am led to the conclusion that it is my duty to participate in a decision of this cause and therefore enter upon a discussion of my views concerning the merits of the controversy.

In the opinion prepared by Mr. Commissioner DAY, which was concurred in by Chief Justice NORVAL before his retirement from the bench and which is now concurred in by Judge SEDGWICK in a separate opinion, the purported warrant on the state treasury is treated as having been properly and regularly issued and delivered to the state treasurer for the purpose of effectuating the object of the legislature in having transferred from the general to the sinking fund the amount mentioned "to reimburse said fund for same amount tied up in Capital National Bank." From these premises and for the reasons stated in the opinions, a conclusion is reached affirming the judgment of the trial court, and which exonerates the defendants from liability by reason of any loss to the state of the funds alleged to have been converted. I can but feel that the premises thus laid, and upon which the conclusion seems to rest, are erroneous and really have no support by the application of any sound legal principles. The warrant, in my judgment, can be regarded as no more than a mere piece of paper containing a memorandum of the act of the legislature authorizing the transfer by the state treasurer of $180,101.75 from the general to the sinking fund. The provisions of the constitution with reference to the manner of drawing money from the state treasury have no application to an act whereby it is attempted to transfer money in the treasury from one fund to another. It is quite true that the legislation is found in a general appropriation act for the payment of "current expenses of

the state government," and is of itself of a crude and imperfect character. Whether this item in the appropriation bill is constitutional, whether the money could be transferred from the first coming into the general fund in the treasury after the law became effective, whether the transfer contemplated by the act must await its turn in relation to the then outstanding obligations on the general fund, or whether it was at all competent for the legislature to create a sinking fund from the general fund to make good that which had been lost by the failure of the Capital National Bank or for any other purpose while there were unsatisfied general fund warrants outstanding, may each be open to serious doubt which it is here idle to discuss or speculate upon. By no logical course of reasoning, however, does it seem to me that this item in the appropriation act could be construed as accomplishing any thing more than an authorization to the state treasurer to transfer from the general to the sinking fund, by simply changing his accounts with respect to such funds, so as to show that one fund had been increased and the other diminished in the amount stated in the law. The accomplishment of the legislative intent and purpose involved a process of bookkeeping and nothing further. The act was in no sense an appropriation of money such as would, when a warrant was drawn in pursuance thereof, after a claim against the state had been adjusted and allowed, create a valid obligation against the state. The state was neither borrowing money nor appropriating money belonging to it to pay itself. The issuance of a valid warrant as an obligation against the state and its treasury presupposes a lawful demand against the state, which has been adjusted by the auditor of public accounts and approved by the secretary of state. On what tenable ground can it be said that by virtue of this legislation for the transfer of money from one fund to another, the state became indebted to Mr. Bartley, either individually or as trustee, to anyone else, or to itself? I know of none. I fully concur with what is said by Mr. Justice SULLIVAN on this phase of the trans-

action in his opinion in this same case on a former appeal, and with the propositions announced in the syllabus relating thereto. *State v. Omaha Nat. Bank,* 59 Nebr., 483.

While the instrument is called a warrant, and is in form what it purports to be, it is in fact and in legal contemplation but a mere recital to the effect that the legislature had undertaken to reimburse the state sinking fund for a like amount tied up in the suspended Capital National Bank by a transfer from the general fund in the amount stated, and no rights could be acquired by any one thereunder as a holder of a valid obligation against the state for the sum called for on the face of the warrant. As well might the state treasurer have taken the item found in the appropriation bill authorizing the transfer, copied it on a piece of paper, and have undertaken to dispose of it as a lawful demand against the state.

Assuming, then, as I do, that the warrant is utterly of no avail to protect any one claiming any rights thereunder, I proceed to a discussion of the liability of the defendants for a conversion as the case is disclosed by the record now under consideration. Mr. Bartley, it appears, had disposed of the paper, which in form and on its face had the general characteristics of a valid treasury warrant, to the Chemical National Bank of New York; such disposition being wholly without right or lawful authority. At or about the time sufficient funds had accumulated in the general fund to meet the warrant, it was transmitted to the defendant bank, a correspondent of the New York bank, for payment or collection, as you may please to term it. Mr. Bartley appeared at the defendant bank and paid the amount called for by the face of the warrant and interest, by drawing his check as state treasurer on the defendant bank as a state depositary, the payee named in the check being the president of the bank, and directing that the face of the warrant and interest thereon at a lower rate than that allowed by law when issued, be remitted to the Chemical National Bank and the remainder of the accumulated interest to the Exchange Bank of

Atkinson, which the defendant bank did, and for which it is now sought to be held liable as a wrong-doer in assisting in the conversion of the amount of money belonging to the state called for by the check thus paid. The pivotal point in the case is whether when money or property is converted by several wrong-doers, the general rule which holds that each and all are liable for the injury resulting to the rightful owner, regardless of the question of intent, motive or knowledge, shall be held to apply to the facts as disclosed by the record, or whether the defendants come within some of the exceptions to the general rule, which it is freely conceded exist, and which are so well recognized as embodying sound legal principles that it would be folly to deny them. In the presentation of the case for our consideration, both the present and the former attorneys-general submit it on the theory that whether the defendants had knowledge of the misappropriation of the state's money, or acted entirely innocently regarding the matter, is an immaterial issue; that they are brought within the general rule as to liability for a conversion, which recognizes no agency, makes all principals, and takes no account of the knowledge or the want thereof, or the motives controlling a party when the effect of his actions is wrongfully to deprive an owner of his property.

As we understand counsel for the state, it is readily conceded that neither the bank nor its president had any actual knowledge of misappropriation of moneys belonging to the state, or were guilty of any impure motive or wrong intent. The former attorney general argues the case almost exclusively on the proposition that actual knowledge or guilty intent are altogether immaterial to a proper disposition of the cause. He says: "Our claim rests on their failure as collecting agent in receiving from Bartley money of the state which Bartley had no authoritly to give them, as they were bound to know and did know from the declarations on the face of the warrant and we insist that whether they had knowledge or not the rule which held Cook in *Cook v. Monroe, supra,* should hold them." The

present attorney general says: "We are glad to join the former attorney general in expressions entirely exonerating defendants from all guilty intent to do wrong. It is their misfortune that innocence and good faith are powerless to release them from a burden which the law says they must bear; but it must be remembered that the state was likewise innocent." The vital question then, is, does the general rule invoked apply, or do the facts as disclosed from the record bring the defendants within any of the recognized exceptions?

While disclaiming that knowledge on the part of the defendants of the wrongful purpose to which the money was being put is necessary in order to render them liable as for conversion, it is noteworthy that the petition and the reply are framed with the view of establishing liability because of knowledge of the nature of the transaction by which the state was deprived of its funds. In the petition it is alleged, in substance, that the defendants well knew at the time of the payment that Bartley had no right to draw the check for the purpose of paying money to the defendants and that Bartley, in drawing the check and delivering it, and causing the bank to pay it, had no right to do so and that his act was illegal and void and a fraud on the state. In the reply it is charged that the warrant was not legally drawn, was null and void and that defendants well knew, at the time it came into their possession and at all times thereafter, that it was of no force as a claim or order against the treasury or against or upon the plaintiff. In the consideration of the case, we should bear in mind that the transaction out of which this action has grown occurred before it was known that the state treasurer had defaulted in his accounts; that at the time of the alleged conversion by the defendants the presumption of honesty in dealings with the state treasurer was to be indulged in, and that defendants were warranted in believing that the treasurer, in the transaction of the state's business, was faithful in the discharge of his official duties. The transaction is to be viewed in the light of known con-

ditions as they then appeared to be, and not as afterwards ascertained actually to have been. From the record before us, we are not justified in inferring that the defendant bank and its president regarded Mr. Bartley and his disposition of the public funds in his custody and control as other than would be expected of a faithful officer in the performance of his sworn duties. There then existed apparently no reason to believe or to raise the suspicion that he was derelict in his duties and unfaithful to his trust. The attorney general devotes some attention in his brief to an argument to the effect that the defendants had at least constructive knowledge of the misappropriation of public funds by the state treasurer which should be charged to them as a matter of law. Such knowledge as they had regarding the nature of the transaction must have been derived from the warrant itself,—what they actually knew by the reading of it or what they are legally chargeable with knowing whether they read it or not. It is the undisputed testimony that the defendants made no examination of the warrant and were unacquainted with its recitals, that the general form and appearance was that of an ordinary state treasury warrant, and further than that they had no knowledge and made no inquiry; that they were in entire ignorance as to the recital therein where it is written, "For to reimburse state sinking fund," and made no such examination of the warrant as would or did reveal the words quoted.

While I was at first thought disposed to regard this evidence as taxing one's credulity to the uttermost, maturer reflection has impressed me with its reasonableness. The bank is one of the larger banking institutions of the state, and probably handles, not only hundreds of thousands, but millions of dollars of money, paper, and credits each business day; and having no direct or legal interest in the warrant, it is not strange or unreasonable that defendants did not concern themselves as to what it was issued for, or the nature and character of the obligation it purported to represent. But it is argued by the state that according

to all the authorities relied on by the defendants knowledge may be either actual or constructive, and that it was at least constructive as to the defendants and they are therefore chargeable with notice of the misuse made by the treasurer of the state's money. Appeal is made to the rule which says the true test as to constructive notice is whether there is anything which raises the duty to make inquiry, which inquiry, if properly made, would reveal the unlawfulness of the transaction,—citing *Duckett v. National Mechanics' Bank*,* 63 Am. St. Rep. [Md.], 513; or, to state the proposition in a different form, if in dealing with a trustee there is sufficient notice to arouse a party's distrust or put him on his inquiry, this will be sufficient to constitute constructive notice. *Bunting v. Ricks*,† 32 Am. Dec. [N. Car.], 699.

The authorities would clearly and emphatically apply to those who claim anything by virtue of the warrant. It would be out of reason to say such party might claim some right under the instrument, and at the same time plead ignorance of its entire scope and legal effect. But will the rule apply to the defendants, who claim nothing under the instrument, and who receive no right or advantage from it? Are they under the legal duty and obligation to ascertain the terms a⁾ l legal effect of the warrant and the application made of the funds in payment thereof, acting, as they did, as a conduit by which the money was transferred from the state's lawful custodian to the Chemical National Bank, and the Bank of Atkinson? Upon what legal hypothesis can it be said that it was the duty of the bank to inquire into the nature of the transaction whereby Bartley · paid the state's money on this warrant to the holder thereof and ascertain whether the instrument was valid or otherwise. "Constructive notice," it is said, "is the knowledge which the courts impute to a person upon a presumption so strong of the existence of the knowledge that it can not be allowed to be rebutted, either from a duty to know, imposed by the law, or from his knowing something which

---

* 86 Md., 400.　　　　† 2 Devereux and Battle's Eq., 130.

ought to have put him upon further inquiry, or from his willfully abstaining from inquiry to avoid notice." 16 Am. & Eng. Ency. Law [1st ed.], 791. It can not be said that any legal duty rested on the defendants, because they had the possession of the warrant, when they claimed nothing under it, to inquire into its recitals, terms and legal effect, nor would mere possession under the circumstances by which they held it, be sufficient to put them on further inquiry as to its contents; and because they did not examine its recitals while in possession of it, does not necessarily raise the inference that they willfully did not do it so as to avoid notice. The recitals in an instrument, if they be outside a purchaser's chain of title, do not charge him with knowledge of defects therein. 16 Am. & Eng. Ency. Law [2d ed.], 800, and authorities therein cited; *United States v. Pinover,* 3 Fed. Rep., 305. The question of constructive notice has become very near *res judicata* in the case at bar against the contention of the state. On the former appeal the point was considered by Mr. Justice SULLIVAN and it was then announced that whether the defendants were to have notice of the recitals appearing on the face of the warrant imputed to them was a question of fact to be submitted to a jury. It was there held, in substance, that from the possession, handling and dealing with the paper, a jury might be warranted in inferring notice of the contents of the warrant. *State v. Omaha Nat. Bank, supra.* On the second trial, however, the evidence is positive and uncontradicted to the effect that the defendants had no knowledge of the written recitals in the warrant which would advise them of its nature and character and the purpose for which executed, nor of facts sufficient to arouse their suspicions that the state treasurer was, in making the payment, misappropriating public funds. We must therefore determine the defendants' liability from the standpoint of ignorance on their part of the unlawful purpose of the state treasurer in paying out public funds, and innocence of intentional participation in a wrongful conversion.

State v. Omaha Nat. Bank.

It is insisted, however, by the state, that the defendants
are liable for conversion regardless of the question of
notice, actual or constructive, or of wrongful intent, under
the rule established in *Hill v. Campbell Commission Co.,*
54 Nebr., 59, and *Cook v. Monroe,* 45 Nebr., 349.   In the
case first cited it is said by Mr. Justice NORVAL, who wrote
the opinion, speaking of conversion generally: "In an
action for conversion, the motive which prompted the de-
fendant to dispose of, or appropriate to his own use, the
property of plaintiff is an immaterial issue.   Whether de-
fendant acted in good faith or not is of no consequence.
*   *   *   If one sells the chattels of another without au-
thority so to do, the act can not be made any the less a
conversion by proving that he acted in good faith, believing
himself to be their owner, or was the agent of one whom he
regarded to be the owner." In the other case cited it is said
(p. 355) : "He who intermeddles with personal property,
which is not his own, must see to it that he is protected by
the authority of one who is the owner or has the authority
to act, or that he will be himself liable; and that if he do
an unlawful act, even at the command of another acting
as his principal, and without right, a liability will attach."
In the former hearing of the case at bar, the principle con-
trolling in the two cases quoted from was stated in the
following form: "Every act of control or dominion over
property without the owner's authority, and in disregard
of his rights, is, in contemplation of law, a conversion.   It
is not the advantage accruing to the defendants from
the act nor the motive inducing it, but the substantial in-
jury inflicted on the plaintiff, which ordinarily constitutes
the gravamen of the action." *State v. Omaha Nat. Bank,*
*supra.*   It will be observed that the principle on which the
rule rests embodies the idea that where an owner of prop-
erty has been wrongfully deprived of it, whoever in the
chain of events intermeddles with the property and assists
in the conversion, exercises dominion and control over the
property without the owner's authority, and deals with re-
spect to its title, becomes a principal in the transaction

and is liable for conversion, without regard to the motives actuating him. The chief or substantial cause of action arises because of the injury resulting to the rightful owner, which is in no way lessened by the good or bad faith of any of the actors connected with the conversion. There are some well-defined exceptions to the general rule which relieve from liability those acting innocently and in good faith. The exceptions will shield those who innocently deal with commercial paper before due, with money which has no earmarks by which to identify it, and those who are transporters of property, bailees, etc., who deal with respect to the custody of, rather than the title to, property, and also those who deal with trustees having lawful possession and control of property, but not the right of its unlimited disposal, and whose lawful authority is restricted to a proper execution of the trust. To those who deal with such property or trust funds, having knowledge of the rights of the *cestui que trust,* and yet participate in a transaction resulting in an impairment of those rights, an action of conversion may be maintained, and recovery had for the damages resulting therefrom, but not otherwise. Mr. Bartley, as treasurer, was acting as a trustee for the state in the discharge of his official duties. He was the lawfully constituted custodian of the moneys belonging to the treasury, and had the rightful control thereof on behalf of the state. He was the legally constituted collecting and disbursing officer of the state, all of which, of course, was known to the defendants. They were entitled to the benefit of the presumption that a public officer, sworn to faithfully administer his trust, would discharge his duties in accordance with law, and that the funds paid by him out of the public treasury would be paid only on lawful demands and valid claims thereon.

In determining the liability of the defendants we can not, in justice to all parties interested, lose sight of the dual position occupied by the defendant bank at the time of the alleged conversion. The bank was then a lawfully constituted state depositary, and it was its duty, in the

absence of knowledge of an unlawful purpose, to pay all
checks drawn upon it as such depositary by the state treas-
urer.   It could not act in a supervisory capacity over the
actions of the treasurer, who was an official choosen to
represent the state in the transaction of its business com-
ing under his jurisdiction.   The bank had no discretion in
the matter and when a check was presented, properly ex-
ecuted, it could refuse to pay such check only by commit-
ting a breach in the conditions of its depositary bond.   In
fact, it is conceded by the state that the payment of the
check was a legal transaction, from which no liability
against the defendants could inure to the benefit of the
state.   In the brief it is said: "It [the state] admits the
legality of the payment of the check but asserts the illegal-
ity of the use to which the proceeds of the check were put."
Nothing then, if the bank acted in good faith, which it is
conceded it did, can be claimed against the defendants by
reason of their action in obeying the directions of the state
treasurer for the payment of the state's money to be
applied on the warrant held by the Chemical National
Bank and in possession of the defendants.   It is agreed on
the part of all that Bartley as the state's trustee had the
lawful custody and control of the state's money in defend-
ant bank as a depositary of public funds and that it was the
defendants' duty to pay such moneys on the checks drawn
by the treasurer in his official capacity, as the law provides
shall be done, and which the defendant is required to do in
order to avoid liability on its depositary bond.   The con-
clusion is irresistible that the payment of such a check
will not ordinarily create a legal liability on the paying
depositary bank, even though the entire transaction results
in a conversion of the state's money.   To illustrate: The
treasurer violates his official duty and loans the money of
the state to an individual and gives to him a check on a
depositary bank on which the individual realizes, and thus
is effected a conversion of so much money belonging to the
state.   It will not, I apprehend, be seriously contended that
the bank, in the absence of notice of the illegal transaction,

would be liable because it paid the money to the one who, with the treasurer, had converted it to their own use. The interest on the warrant in controversy, credited and paid to the Atkinson Bank, was as much a conversion as the supposed case; but the defendants, it occurs to me, can not be held liable except on the theory that they had notice of the unlawful purpose of the state treasurer in thus wrongfully depriving the state of its property.

The check drawn by Mr. Bartley in payment of the warrant, while given in the name of the president of the bank, was in legal effect an assignment (admitting the same to be lawful) of the funds it called for, not to the president of the bank (the payee) nor the bank itself, but to the Chemical National Bank of New York and the Atkinson Bank. They were the beneficial owners of the money. It was to them the state treasurer directed the payment to be made. It is difficult to discern any sound legal distinction by which the transaction can be divided into separate parts, one of which is legal and the other illegal. If it is admitted, as it is, that the payment of the check drawn by Bartley on defendant bank as a state depositary is legal and valid, and for which no right of action accrues to the state, then it occurs to me that the completion of the transaction by paying the money to whom it was directed to be paid and for which the check was drawn follows as a logical and legal sequence of the act of paying the check presented on the depositary bank. If the bank had knowledge of the wrongful use being made of the state's money, then it could be held as a participant in the conversion resulting from the transaction. If it was without sufficient notice of the wrongdoing to charge it with responsibility for the payment of the check, then certainly it was possessed with no additional knowledge when it transferred the money to whom it was directed to be paid by Bartley, and did only that which could be reasonably expected it would do, and which it was under legal obligations to do, after the payment of the treasurer's check under the directions given by Bartley at the time. The

two transactions are so closely interwoven and intimately connected that they can not well be separated and one held good and other bad.  If it were right and proper for the bank to pay the check, then what, in sound reason, could it do but complete the transaction by transferring the money to whom it was supposed to belong? It was not warranted in keeping the money, for that certainly would be a conversion.  It could not return it to Bartley or the state, for that act would involve a self-contradiction and include an admission that it was wrongfully paid out and for that reason should be returned.  It logically follows that nothing was left for the bank to do, after the check had been paid, but pay the money to the Chemical National and Atkinson banks, in pursuance of the state treasurer's instruction, if at the time it honestly believed them rightfully entitled to the money.

The state, however, insists that the act of the defendants in taking and delivering the money and aiding Bartley in disposing of it was the conversion and no authority which the bank may claim, either from Bartley or the Chemical National Bank, can excuse that fact.  It is said the principle to which we have adverted as to conversion generally must control, and that "the court is governed by the principle of the law and not by any hardship in any particular case."  In *Stephens v. Elwall*, 4 Maule & S., 259, an early English case cited by the state, in which the above quotation appears, it is said by Lord Ellenborough: "The clerk acted under an unavoidable ignorance and for his master's benefit when he sent the goods to his master; but nevertheless his acts may amount to a conversion; for a person is guilty of a conversion who intermeddles with my property and disposes of it, and it is no answer that he acted under authority from another, who had himself no authority to dispose of it."  The rule invoked, it is admitted, is a severe one and in many cases works a hardship to one who has acted innocently regarding a transaction resulting in the wrongful conversion of the property of another.  But the rule is founded in the wisdom of the ages, has the almost

63

universal sanction of the courts, and is believed to enunciate a sound principle of law, which should govern, rather than any hardship in any particular case. But ought the rule to be carried further than the reason of it requires? Does it not embrace the fundamental principle that whoever voluntarily intermeddles with property without authority from the owner, which results in a conversion, is liable for the injury done? Is not, in such a case, every step in the transaction a wrong, each contributing to the resulting injury? Can it be said that the servant in the case cited acted legally when he received the property of the bankrupt, but was guilty of an actionable wrong when he delivered it to his master? Certainly not. The wrongful action had its inception at the very beginning of the transaction. He was an intermeddler from the first. He had no authority to take the goods in the first instance, and every act from the inception of the transaction to its close was wrongful, and for which he became liable for conversion. In an earlier English case than the one last cited, it is said by Mansfield, C. J.: "But it seems a monstrous thing to say, that every one who takes money in the character of a messenger or bearer, should be so liable; it may happen to pass through the hands of two or three persons, who would each be liable to such an action. No case goes that length, and the doctrine of the relation of the act of bankruptcy, is in all cases extremely hard, and in many shocking, and it is not to be carried further than we are compelled to carry it." *Coles v. Wright,* 4 Taunton [Eng.], 198. In a Massachusetts case decided in recent times (*Hills v. Snell,* 104 Mass., 173), it is said by the supreme court of that state, speaking of the rule invoked by the state: "But this severe rule of law will not be applied when the act of appropriation can be justified as having been authorized in any manner by the owner of the property. * * * When the owner has given to another, or permitted him to have, control of the property, no one can be held responsible in tort for its conversion who merely makes such use of the property or exercises such dominion

over it, as is warranted by the authority thus given,"—citing *Strickland v. Barrett,* 20 Pick. [Mass.], 415; *Burbank v. Crooker,* 7 Gray [Mass.], 158. The bank was acting by the direction and under the presumed authority of the state treasurer as much or more so than as the agent of the Chemical National Bank. Bartley had the control and lawful custody of the public funds, acting as the agent and trustee of the state. The bank might rightfully presume, in the absence of notice to the contrary, that the money was being paid for a lawful purpose and in the discharge of a valid obligation. In short, without notice of a different purpose, it was warranted in presuming that the treasurer, as the state's trustee, was discharging the duties of his office honestly and in conformity with law. The treasurer being the lawful custodian of the funds belonging to the state, and acting in the capacity of a trustee in respect of the duties of his office, this cause must be decided by the rule which fixes and controls the liability of one who deals with a trustee, rather than by the application of the general rule which is invoked by the state. The act of Bartley in paying out the state's money was unlawful and a wrongful conversion of it. The receipt of it by the Chemical National Bank and the receipt by the Atkinson Bank were likewise conversion, because they were bound to know and it was their duty to know that the state treasurer was without legal authority to pay them the state's money on a claim which was void *ab initio.*

The defendants, however, conceding, as is done, that they were without notice of any intended wrongful application of the money, and having derived no advantage nor claimed anything by reason of the void warrant, occupy an altogether different position. They were dealing with one acting apparently within the scope of his legal authority, who had the lawful control of the property with reference to which the defendants were dealing. In addition to this, it was the manifest duty of the defendant bank to pay on the treasurer's check, as directed by him, the moneys it had on deposit belonging to the state. The case of *Fifth Nat. Bank v. Hyde Park,* 101 Ill., 595, cited

by Judge SEDGWICK in his concurring opinion, is one quite
in point in principle with the case at bar.  That was a
controversy over a misappropriation of funds belonging
to a municipality by its treasurer.  The decision rested on
the proposition that a party receiving trust funds in pay-
ment of a private debt was not liable unless he was aware
at the time he received the trust funds that the debt to
which they were applied was not a debt to which the
trustee could lawfully apply the trust funds and that he
knowingly participated in a breach of the trust.  It is said
in the opinion (p. 608) : "The teaching of all the authori-
ties is consonant with the proposition that to charge a
stranger as a party to the misappropriation of a trust fund,
such stranger must knowingly partake in the breach of
trust; that he must know or have proof of facts which in
law characterize the transaction as a breach of trust."

· In *Duckett v. National Mechanics' Bank*, 86 Md., 400,
404, it is said on the same subject: "This liability of the
bank depends, however, altogether upon the contingency
that it knowingly aided the trustee, Clagett, to commit the
default of which he was undeniably guilty.  If without
knowledge of Clagett's misconduct, or if without sufficient
notice to put it on inquiry that would have enabled it to
ascertain that Clagett was mingling with his individual
deposits and using as his own, money that the bank knew
or had the means of knowing was trust money; or if the
bank was merely the innocent agency through which,
without fault or negligence on its part, Clagett depleted
the trust estate, then it was not guilty of aiding him in
misappropriating the trust fund and is not liable to re-
store it."

*Caulkins v. Gas-Light Co.*, 85 Tenn., 683, was an action
for the conversion of stock of a shareholder in a corpora-
tion by a trustee, in which was involved the question of
the liability of an innocent party who dealt with reference
to such stock, as well as an agent with notice.  It is there
held: "An agent who knowingly aids a trustee in making
or procuring the conversion or unauthorized transfer of
shares of stock in a corporation, held in trust for another,

State v. Omaha Nat. Bank.

is liable for the loss sustained by the *cestui que trust,* although he acted in the matters of the agency 'without benefit or profit to himself.' " It is also held that: "A purchaser of shares of stock of a corporation affected with a trust in the hands of the holder, can not be held liable to the beneficiary for damages or return of the stock if his purchase was made in good faith, for value, and perfected without notice, actual or constructive, of the trust,"—citing *Cherry v. Frost,* 7 Lea [Tenn.], 1; *Cornick v. Richards,* 3 Lea [Tenn.], 1.

In *Munnerlyn v. Augusta Savings Bank,* 88 Ga., 333, 338, in discussing the rule, the court says: "Of course, if the bank actually knew the trustee was misapplying the trust money and aided him in so doing—as, for instance, by endeavoring to appropriate such money to the payment of a debt incurred for his private benefit and due by him individually to the bank,—an entirely different question would be presented." See, also, *Tousley v. Board of Education,* 39 Minn., 419; *Union Stock Yard and Transit Co. v. Mallory,* 157 Ill., 554; *Howard v. Deposit Bank,* 80 Ky., 496; *United States v. American Exchange Nat. Bank,* 70 Fed. Rep., 232, and authorities therein cited.

Other similar authorities might be cited, but it seems unnecessary. The distinction we have endeavored to draw is that the bank received the money of which it is charged with the conversion from one having the lawful custody and possession thereof as trustee, and in the absence of knowledge or of facts sufficient to put it upon inquiry, and acting merely as an innocent agency for the transfer of the money to the holder of the warrant, it would not be guilty of conversion, and the general rule relied on by the state to fix liability of the defendants is not applicable under the facts as disclosed by the record. Entertaining the opinion I do, as indicated by the foregoing, I concur with my associate in the judgment of affirmance. There is much that occurred during the trial of the cause in the lower court which I do not approve of, but as the result arrived at is the only one that rightfully could be reached, the irregularities

occurring at the trial can be regarded only as errors without prejudice.

SULLIVAN, C. J., dissenting.

The warrant in question was twice handled by Mr. Millard. As agent of Bartley he sold it to the Chemical National Bank, and as agent of the Chemical National Bank he afterwards delivered it to Bartley in exchange for $201,884.05 of the state's money. The jury found that the words, "For to reimburse the state sinking fund," plainly written upon the face of the warrant, did not attract Mr. Millard's attention when he received it from Bartley and sent it to New York, nor when he received it from the New York bank and delivered it to Bartley, nor even when it lay before him on his desk while the interest upon it was being computed. The jury also found that the possession by Bartley of a warrant supposed to evidence a debt due to him from the state amounting to $180,101.75, did not at any time excite Mr. Millard's special wonder or cause him to inquire by what strange chance a solvent-commonwealth could have become so heavily indebted to its own treasurer. These findings are approved by the decision, and defendants are acquitted on the theory that the payment was made under apparent authority and that they, in receiving the money, acted in good faith and hence committed no actionable wrong. The weakness of this position is clearly pointed out by Commissioner HASTINGS, but it may be well enough to emphasize what he has said. The powers and duties of public officers are definitely fixed by law, and since every one is conclusively presumed to know the law, it is perfectly clear that in the transaction we are considering the real authority and the apparent authority of the state treasurer were exactly the same. Evidently the doctrine of apparent authority, which is a branch of the law of estoppel, has nothing whatever to do with this case; it is wholly and obviously irrelevant. But if an estoppel may, under any circumstances, be alleged against the state, which in view of *Philadelphia Mortgage*

& *Trust Co. v. City of Omaha,* 63 Nebr., 280, must be regarded as at least doubtful, what is there in the present record to justify the court in refusing to take notice of the statutory limits of the treasurer's power? Surely defendants can not, with any show of reason, insist that the unauthorized payment of the warrant, the wrongful act which they themselves abetted and participated in, operated as a practical enlargement of the treasurer's authority. As well might a parricide ground an appeal for compassion or clemency on the fact that he was an orphan. Bartley's real authority was to disburse the public funds upon valid warrants and not otherwise. Compiled Statutes, 1901, ch. 83, art. 4, sec. 2.* He had no semblance of authority to pay an invalid warrant; and yet this is precisely what he did. He not only paid out the state's money upon a warrant which proclaimed its own illegitimacy, but he paid it out directly to the defendants, the holders of the warrant. How they could be legally innocent in receiving money which they knew belonged to the state, and which was turned over to them without the actual or apparent consent of the state, is something which I have never been quite able to understand. It is true that the defendant bank as a state depositary was under a general obligation to honor the treasurer's checks, but it was certainly under no such obligation when the treasurer's check transferred to itself money for the payment of a claim which it held for collection and which the treasurer had neither actual nor apparent authority to pay. To get a clearer view of the transaction let us separate the capacities in which the Omaha bank was acting. As agent for the Chemical National Bank it had in its hands for collection a spurious claim against the state. As a state depositary it had in its vault a large amount of the state's money. As agent of the New York bank it obtained from the state treasurer a check evidencing the treasurer's permission to take $201,884.05 of the public funds for a specific purpose. It availed itself of this permission. It had access to the state's money, and,

* Cobbey's Annotated Statutes, sec. 9124.

as a private collecting agent, laid hold of a sufficient sum
to pay the worthless warrant. If the same warrant had
been presented at the treasurer's office in this city, and if
it had been there paid, it would, we presume, be readily
conceded that the payment was one which the treasurer
had neither real nor apparent authority to make, and that
the receiving and removing of the money by defendants
would be a conversion of it. But what conceivable differ-
ence can it make whether an unlawful payment is made in
Lincoln or in Omaha, if in either case the money paid be-
longs to the state? And what possible difference can it
make whether the money is actually paid out by the hand
of the treasurer or is seized and taken by a person who has
the treasurer's permission to seize and take it? In the case
at bar defendants, with the treasurer's permission in the
form of a check, went into the vault of a state depositary
and there helped themselves to the state's money. The
transaction was essentially the same as though Mr. Mil-
lard had presented the warrant at the treasurer's office
and had, with Bartley's consent, gone into the vault and
helped himself to $201,884.05 of the state's money.

Syllogistically stated, the whole matter is this: The
statute in effect declares that money can be lawfully ob-
tained from the state treasury upon valid warrants and
not otherwise. The defendants obtained the money in
question from the state treasury upon a warrant that
was not valid. Therefore, they obtained it unlawfully.
The law does not discriminate between wrong-doers. It
makes no exception in favor of persons who act for others
and not for themselves. An agent, even though he act in
good faith, must, before he can rightfully lay his hands
upon the public funds, produce a valid warrant; the pos-
session of something that looks like a warrant is not suffi-
cient.

A more complete and elaborate statement of the
grounds of my dissent will be found in the following opin-
ion of Commissioner HASTINGS, which is, in my judgment,
a demonstrative answer to all that has been said in support
of the conclusion reached by the majority.

HASTINGS, C., dissenting.

The writer, with the utmost regret, finds himself unable to agree with the conclusions of the learned commissioner to whom this cause was assigned. This regret is increased by a thorough knowledge of the pains and conscientiousness with which he has considered and investigated the case, and, still further, by the political aspect which it has borne since its inception. The result, however, of the most careful investigation which the writer has been able to bestow upon it, is all that can be given.

On this third appearance of the case, the state of facts differs in only two material respects from that set forth in the former opinion, 59 Nebr., 483. That opinion was written under the impression that the warrant, whose payment is the foundation of the action, had been indorsed by "J. H. Millard, Pt." The uncontradicted testimony at the last trial is to the effect that the name "J. H. Millard, Pt.," on the back of that warrant, was not there when it was paid and surrendered, and is not in Mr. Millard's handwriting. The fact also developed at the last trial that this warrant was sold through the defendants, Millard and the Omaha National Bank, and was by them transmitted to New York, as the result of such sale, to the Chemical National Bank. This fact appeared as long ago as the trial of treasurer Bartley on a criminal charge (*Bartley v. State,* 53 Nebr., 310, 333), but was not shown at the former trial of this case. At the former trial, the jury were instructed to find for the defendants. It appears that in reviewing that trial in this court Chief Justice NORVAL did not sit, and that Justice HARRISON concurred only in the conclusion that the case should be reversed, because of the refusal of the trial court to dismiss the case without prejudice on the plaintiff's motion. In the opinion by Justice SULLIVAN, the conclusion is expressed that the collection of this warrant by the Omaha National Bank and its president was a conversion. The action of the court in finding prejudicial error in denying the motion to dismiss

without prejudice and in sending the case back for retrial, was equivalent to saying that a cause of action was alleged. Probably the former reversal, in the manner in which it took place, can not properly be said to establish anything else as the law of the case.

At this last trial the one question referred to the jury was whether or not the defendants had actual knowledge of the want of right of the treasurer to draw this check to pay the warrant in question. The finding was that defendants had no such knowledge, as a verdict was rendered in their favor. The errors complained of by the state are: (1) The refusal to give either of the peremptory instructions for a verdict in plaintiff's favor, either against all the defendants or against the bank alone; (2) certain alleged errors in the admission of testimony; (3) that the instructions are erroneous, and did not properly submit the question as to the defendants' knowledge, even if that shall be found to have been required to be submitted. The defendants assert: (1) That no cause of action is set out in the petition; (2) that, if there is any, it is only for conversion, and no conversion is shown by the evidence; (3) that there was no error in refusing plaintiff's instructions for a verdict, but on the contrary one should have been given for a verdict for defendants; (4) any error in the instructions or in admitting evidence for defendants is wholly immaterial, as under the facts shown there could be no recovery.

It will be seen from this that the parties to this cause disagree in their positions and conclusions with a completeness rare even in lawsuits. Perhaps one cause of this may be the complicated situation, and the different positions held at the same time by the parties to the transaction. In it Bartley appears as Joseph S. Bartley individual, and as state treasurer. Mr. Millard appears as an individual, as an agent negotiating the sale of this warrant, and as president of the Omaha National Bank. The Omaha National Bank appears as state depositary, as an agency for the sale of the warrant, and also for its collection on behalf of the Chemical National Bank. The

rights and liabilities of each of these parties vary greatly
in the different capacities in which they act.   One of the
results of neglecting these changes in the relative posi-
tions of the parties is shown in the claim of defendants
that it was incumbent upon the plaintiff to show that
Bartley did not put the proceeds of the sale of this war-
rant into the state treasury.   It need only be.pointed out
that Bartley sold the warrant and indorsed it as an indi-
vidual.   The claim that, as a public officer, he is presumed
to do his duty and put the money of the state into the
state's treasury, has no application when it is considered
that in the very act of selling the warrant he was claiming
property in it,—asserting ownership of the warrant and
consequently of the money received for it.   That money
was either his own, if he had the right to sell the warrant,
or the Chemical National Bank's, if he had no such right;
and in either event there is no presumption that one cent
of it was placed in the state treasury.

The transaction of the sale of the warrant is not men-
tioned directly in any of the pleadings in this case.   The
petition merely alleges authorization by the governor of
the bringing of this action; the incorporation of the de-.
fendant bank; that it was a state depositary, and Millard
its president; that Bartley was state treasurer, and had
in the bank more than $201,884.05 to the credit of the
general fund; that on January 2, he fraudulently drew his
check for that amount payable to J. H. Millard, Pt., on the
defendant bank, and so unlawfully directed it to pay itself
and Millard that amount; that the money was paid to Mil-
lard and by him to the bank; that the bank had no claim or
right to it, and that the defendants well knew this, and
that Bartley had no authority to make the payment; that
in accepting payment of the check, defendants wrongfully
took the money and "by reason of the premises" unlaw-
fully converted to their own use the money, to the damage
of the state in that amount; and that Millard acted per-
sonally,—not as agent or president in what he did.   The
answers admit the character and positions of the defend-

ants in the making of the check; say it was intended to be in favor of the bank, which at the time held as collecting agent for the Chemical National Bank of New York the warrant, and that it had been registered; that the New York bank was a regular correspondent; that Bartley came of his own accord and without solicitation and delivered the check, which was charged to the general fund account, as therein directed; "that the defendant bank without delay, and in the due and ordinary course of business fully accounted to the said Chemical National Bank for the said sum and every part thereof;" deny that the money was received for defendants' benefit, or that they derived any profits from the transaction; deny all notice or knowledge that the check was wrongfully or fraudulently drawn; deny any knowledge of the warrant's form or of the purpose for which it issued, or any knowledge that it was not a valid obligation of the state which Bartley had lawful right and authority to pay; allege that the warrant was in fact a legal obligation of the state, and that the state, through Bartley, treasurer, received its full proceeds, and was legally liable for its payment; and that the state has no cause of action because of any acts or things set forth in the petition. The reply denies all new matter; sets out in full the warrant, dated April 10, 1895, for $180,101.75, drawn to the order of J. S. Bartley, to be paid to him "for to reimburse state sinking fund," which appears in full in the former opinion of this court. The reply alleges that the check and money of the state were paid to Millard for the purpose of paying said warrant, and that upon such payment defendant bank surrendered the warrant to Bartley, and that it constituted the only consideration for the sum of $201,884.05 so paid to defendants; that the warrant was null and void, and the defendants were aware that it was no claim against the state; that defendants had no right or authority to collect it or receive the money; and denies that any of the proceeds of the warrant were received by the state.

Whether the warrant was void or valid, it did not belong

to Bartley, and he had no more right to sell it than he had to sell the state's capitol building or the ground it stands on. It is hardly necessary to cite any of the numerous declarations to that effect, which have been made by this court. "The title to the warrant never vested in him, and he could not transfer to another by indorsement that which he never possessed. He could not divest the title of the state in the warrant by the sale thereof to the Chemical National Bank, since he possessed no power to sell or negotiate the instrument. Nor was the bank an 'innocent purchaser' within the meaning of that term as applied to commercial paper, inasmuch as the warrant disclosed on its face the purpose and object for which it was drawn, and the bank was bound to know at its peril that the defendant had no title to the instrument." *Bartley v. State,* 53 Nebr., 310, 335. On the rehearing of the same case another judge of this court announced the conclusion: "We are entirely satisfied with the arguments and conclusions on this subject expressed in the former opinion." 55 Nebr., 294, 298. When the action of the state against Bartley's bondsmen was before this court, it said, as to this warrant and the money used to pay it: "The warrant and the money were the property of the state. The designated sum was but to be changed from one fund to another, as authorized by the legislative act, and the treasurer took the method indicated, presumably to effect the desired transfer." *State v. Bartley,* 56 Nebr., 810, 817. On the following page the court approves unreservedly an instruction of the trial court that Bartley had no right or authority to transfer this warrant to the Omaha National Bank, nor to pay it to that bank, nor to any one else, except into the sinking fund of the state of Nebraska.

The suggestion of counsel that one deficit can not be made good out of another, and so Bartley should be held authorized to raise the money on this warrant, can not be considered for a moment. The sinking fund was to be made good, not by borrowing on the credit of the state, but by an appropriation out of the general fund. The

treasurer, after the warrant was issued, had only to regis-
ter it, as he did, and wait for the money to come in, as it
came, and then pay it to the credit of the sinking fund. By
so doing he would have lost the opportunity to direct de-
fendants to credit the Exchange Bank of Atkinson with
the difference between 6 per cent. per annum interest and
7 per cent. on the whole amount for the entire time the
warrant was outstanding, but would have executed the
law. It will, therefore, be considered henceforth in this
opinion as settled that Bartley had no interest in the
warrant, and that the face of it so disclosed and, there-
fore, he sold none.

Was its collection from the state by the defendants a
conversion of the funds so collected? Defendants say
that the petition is an allegation of conversion of money,
that it is clear that no money passed, and that the ac-
tion therefore fails. The petition is an allegation of a
payment and a wrongful application of a fund in a bank
by means of a check. If the facts alleged amount to a
legal wrong and show a damage to the state, it seems
hardly material whether the conclusion of the pleader
that "by reason of the premises" defendants converted
money is correct or not. It is true that an allegation of
conversion is not regarded as a conclusion, ordinarily,
but here it is expressly stated as such. The question is
as to the legal wrong in taking payment on this warrant.
The taking it in the form of a check on their own bank
hardly makes it any the less a wrong on defendants' part,
if its taking was unlawful. There can be no claim that
defendants were misled by the conclusion in the petition
that the transaction was a conversion of money. It would
seem that the state had a right to bring this action on
the assumption that there was money in the vaults of the
bank, subject to its control and direction as to the per-
son to whom the payment should be made until the check
was issued and that by the check it passed to defendants,
and passed through the defendant Millard, in whose
favor the check was drawn. What was accepted and

treated by the parties as money may be so held in the courts. Such is the holding in the case of *State v. Bartley, supra*. Surely the rule is as applicable to civil as to criminal pleading. Whatever argument might be urged against the conviction of Bartley for embezzling money on the ground that the information must describe the actual transaction, in a suit for damages what has been accepted as money, served all the purposes of money, and was regarded and treated by the parties themselves as money, should be deemed such. There seems no reason in this case to change the deliberate conclusion of this court in *Bartley's Case*, that this is to be held as equivalent to a payment of money.

Was it tortious on the part of the defendants? There seems to be no question that the presentation and collection of a non-negotiable instrument on behalf of one who has no title is a conversion of the instrument and the funds received upon it. *Koch v. Branch*, 44 Mo., 542; *Murray v. Burling*, 10 Johns. [N. Y.], 172; *Donohue v. Henry*, 4 E. D. Smith [N. Y.], 162; *Boyle v. Levings*, 28 Ill., 314; *Tilden v. Brown*, 14 Vt., 164. That this instrument was not negotiable has been sufficiently declared by this court as above shown. It can not be necessary to cite additional cases as to the non-negotiability of vouchers of this kind drawn upon a special fund, nor as to the form of this one.

The distinction between the case under consideration and *Koch v. Branch*, *supra*, consists merely in the fact that in *Koch v. Branch* the government voucher under consideration was stolen from its rightful owner and in this case the warrant was embezzled, and in the further fact that in *Koch v. Branch* the payment was made by one who had no connection with or authority from the owner. As the conversion arises from want of title, it would seem not to make much difference whether the warrant was stolen or embezzled or even lost. The collection for one not the owner is the conversion. What difference in this respect does it make whether it was stolen by a stranger or purloined by an unfaithful treasurer?

But in the present case this same treasurer accepted the warrant and by his check paid defendants the money to be applied on it. In this it is sought to find a distinction which will relieve defendants from liability. Undoubtedly the severe rule of law by which one who has in good faith, and fully supposing him to be the owner, participated in a transfer of property from a wrong-doer, is held liable for its conversion, is not applicable, when the act of appropriation can be justified as having been authorized in any manner by the owner of the property. Somewhat singularly the very circumstance which is relied upon by the plaintiff to fix upon the defendants liability for conversion of this money is brought forward by them as their defense, viz., that it was paid to them by the state treasurer for the discharge of this identical warrant. The state says that the payment of this warrant to the Chemical National Bank was a wrong, and because the state's money was by the defendants received for this wrongful purpose its reception was a conversion, and the fact that it was so designated to be paid by the state treasurer made all of the money received for that purpose a specific fund, which was received under an obligation at the moment of its taking to turn it back to the state, and that this rendered its reception by the defendants a conversion. As held by Lord Mansfield, the taking of money for an illegal purpose rendered it specific. *Clarke v. Shee,* 1 Cowper [Eng.], 197. The defendants, on the contrary, say that the payment having been made by the full assent and direct authorization of the state's treasurer, it must be held to have been made with the assent of the state, and no conversion can be predicated upon a taking with the plaintiff's assent. *Hills v. Snell,** 104 Mass., 177; *Strickland v. Barrett,* 20 Pick. [Mass.], 415.

Here we find the importance in this case of the question of notice and knowledge on the part of defendants and of their good faith in the transaction. It is vehemently

* 6 Am. Rep., 216.

asserted for the state that the question of good or
bad faith on the part of defendants is of no conse-
quence whatever; that the sole question is whether
or not the warrant in question was the property of the
state, and, consequently, whether or not the money paid
to the Chemical National Bank was the state's money,
and its receipt, therefore, a conversion, and that the good
faith or bad faith with which it was paid is entirely un-
important; that it makes no difference in this action how
thoroughly the defendants believed in the title of the
Chemical National Bank, that belief was no protection
unless it was well founded.

It seems clear, both from the decisions of this and other
courts, that in a genuine case of conversion the good or
bad faith of a party is unimportant. The cases cited above
and the numerous ones in plaintiff's brief establish that
where property is converted it is the harm done, not the
intention to wrong, that gives the right of action. If any
one converts your goods he is liable for them, no matter
how firmly he believed he had the authority of the true
owner. If there was really a conversion, his good faith
does not matter. It may, however, be of the utmost im-
portance in determining whether or not the transaction is
a conversion. Its importance in this case grows out of the
fact that if the defendants had actual knowledge of the
wrong which the treasurer was perpetrating, then any
assent which he might give would be entirely unavailing
and useless to them. If the assent of the treasurer to this
payment would be enough to prevent its amounting to a
conversion on the part of a wholly innocent agent, then it
becomes of consequence to know whether the agent was
innocent. Otherwise, it would not matter. The learned
district judge seems to have been of the opinion at the
first trial that the assent of the treasurer to the transac-
tion was a sufficient protection to defendants, even in
paying the state's money to one who had no title to it, if
they acted in good faith; and he seems to have further
thought that there was in the case no evidence of bad

64

faith, and he, therefore, instructed the jury to return a verdict for defendants. In the last trial he seems still to have been of the opinion that the assent of the treasurer to this payment was a sufficient protection to defendants if they were acting in good faith, and therefore the question of their knowledge of the lack of right on the treasurer's part was attempted to be submitted to the jury. So far, then, as concerns the alleged error in refusing the peremptory instructions, the question is to what extent the assent of the treasurer to this payment is available to defendants in this action. Evidently if they were acting in bad faith and with actual knowledge of his wrongdoing, it can avail them nothing. If, however, the question of their good faith was properly submitted to the jury, the verdict of the jury will have to be taken as conclusive on that subject. Granting that they had not actual knowledge of the treasurer's lack of right to make the payment, did the treasurer have such authority that his assent would take away from this payment its character of a conversion? As is shown above, the collection of the money for one who is not entitled to it upon a stolen or embezzled voucher is conversion, without regard to the good or bad faith of the one collecting it. Their good faith, then, will avail them nothing, except to entitle them to claim the protection of the treasurer's assent for whatever it may be worth.

A similar suggestion might be made as to the contention over whether or not defendants are bound by the terms of this warrant and chargeable with knowledge of its contents. It, like the whole question of defendants' good faith, is important only as it may aid or prevent their claiming protection from the state's supposed assent to this payment. There are, of course, two rules as to notice. One prevailing where, as in the case of negotiable instruments, a presumption of good faith exists which the other party must overcome and which relieves from the duty of investigation and inquiry, and demands only that ignorance shall not be in bad faith or intentional or willful. The

other arises where there is no such presumption, as where one is claiming more rights than his grantor had because of *bona fides* in a purchase of property. The necessity of showing affirmatively good faith puts upon the claimant the duty to make such inquiry as a reasonable and prudent man would, and charges the purchaser with knowledge of anything which such inquiry would have shown him. In this case, if the treasurer had been acting throughout within his apparent powers, it would seem that defendants might claim the protection of such a presumption. It would seem that there is at least as much presumption in favor of the rightfulness of official action within the limits of an officer's statutory authority as there is in favor of the good faith of a transfer of negotiable instruments. If the action of the treasurer had been within the terms of the statute as to paying public money, then it would seem that actual knowledge or ignorance so nearly willful as to indicate bad faith would be necessary to charge defendants with participation in his frauds. But the treasurer was known to be a trustee dealing with trust funds and defendants were bound to learn the extent of his authority. *O'Herron v. Gray,* 168 Mass., 573, 60 Am. St. Rep., 411, 40 L. R. A., 498; *Atkinson v. Atkinson,* 8 Allen [Mass.], 15; *Shaw v. Spencer,** 100 Mass., 382, 97 Am. Dec., 107; *Duncan v. Jaudon,* 15 Wall. [U. S.], 165; *Colonial Bank v. Cady,* 15 App. Cases [Eng.], 267. The utmost confidence in him on their part will not avail them to stretch that authority one particle. Actual knowledge of his fraud would do away altogether with any protection from his assent, however good the authority behind it.

How much is his assent worth to remove from this transaction its character of an unauthorized interference with the state's property, and so a conversion? It is necessary, first, to look again at the terms of the warrant. Somewhat curiously the defendants in their answer plead that at the time of the transaction "the form and nature of said warrant, and the purpose for which it was drawn and issued

*1 Am. Rep., 115.

was wholly unknown" to said defendants but "each in good faith understood and believed and had good reason to understand and believe that said warrant paid by said check was a proper and lawful warrant to be paid out of said fund and had been properly issued by authority of law." Following this, in two or three different forms, are allegations that the warrant was a valid and legal claim against the state, and in one paragraph, as above shown, that the state had received its proceeds and was legally bound to pay it. The warrant itself, as has been stated, read as follows: "Pay to J. S. Bartley or order $180,101.75 for to reimburse state sinking fund." The defendant Millard and the other officials of defendant bank, who testify, swore that they never read the warrant and did not know its terms, yet they appeal to it as a justification of their action, and declare that they paid it in good faith. Nevertheless, they admit that out of the money paid ostensibly upon this warrant only $198,-253.65 was paid to the Chemical National Bank. By direction of Mr. Bartley and the Chemical National Bank, $3,630.40 was credited to the Exchange Bank of Atkinson.

It does not seem possible that defendants can be allowed any greater justification for a payment of money upon a warrant than is given them by its terms. If they read it and acted upon it they are entitled to such protection as its terms give. If they did not read it and did not act upon it, but acted as they say they did upon the directions they received from Treasurer Bartley and the Chemical National Bank, then they are entitled to such protection as that authority gives. It seems clear that this warrant is no authority for the payment of any money anywhere, except into the state sinking fund. If that is the case, then by reason of the possession of this warrant they have no protection in paying the money to the Chemical National Bank and the Exchange Bank of Atkinson. They are, at the most, no better off than if they had paid on Bartley's direction alone without a warrant at all. They seem to have feared that they might be worse off on its account.

If they did not read the warrant and did not know its contents, after acting solely on the direction of the Chemical National Bank and Mr. Bartley, they must rely on the authority of such direction.  Such authority as the Chemical National Bank had over state funds depended upon its possession of this warrant, and in the buying, retaining and collecting of this warrant it was a wrongdoer and a tort-feasor.

Counsel for defendants are entirely correct in saying that the action of trover for a conversion of property is old and its principles well established.  One of them is that the assisting in an unlawful and unauthorized sale, in derogation of the owner's right, of property, is a conversion, no matter how innocent the seller or purchaser may be as to knowledge of the true owner's claim.  Experience having shown that facility in disposing of property was of the utmost assistance to the thief and embezzler, the law has placed upon all who assume to assist in a transfer of title the obligation to learn at their peril the rightfulness of the ownership they help to transfer.  The cases cited by plaintiff in error in this court amply bear out the doctrine, and many more are gathered in the note to *Bolling v. Kirby*,* 24 Am. St. Rep., 789, 812.  Noticeable for emphatic assertion and discussion of this doctrine is *Velsian v. Lewis*,† 15 Ore., 539; *Koch v. Branch*,‡ 44 Mo., 542.  A mere depositary or a carrier who has only incidentally assisted in a transfer, is not liable. *Burditt v. Hunt*,§ 25 Me., 419.  The reason given is that he acts on the location, and not the form nor ownership of property.  It is only an asportation, not a conversion, on his part.  But the same court held that even as to instruments payable to bearer, the agent who sold them for the receiver of a thief was absolutely liable for the property. *Kimball v. Billings*,‖ 55 Me., 147.  In *Alexander v. Swackhamer*,¶ 105 Ind., 81, both the commission house that in good faith bought cattle from one other than the true owner and

---

* 90 Ala., 215.                ‡ 100 Am. Dec., 324.        ‖ 92 Am. Dec., 581.
† 3 Am. St. Rep., 184.        § 43 Am. Dec., 289.          ¶ 55 Am. Rep., 180.

the firm getting them from the first buyer, who sold and delivered them in a distant state, were held jointly liable for their value. That one who attempts to get and to assert title to other than money or negotiable instruments must at his peril learn the soundness of that title, seems beyond all dispute. The Chemical National Bank, then, in buying and in collecting this warrant, was a tort-feasor. It seems reasonably certain that neither the warrant nor the directions from the Chemical National Bank will serve as a justification for the defendants' disposition of this money, or for their taking it with a view to that disposition.

Will the authority of treasurer Bartley serve any better? Bearing in mind that defendants say they never read this warrant and did not know what it contained, and that the action of the Chemical National Bank was that of a wrong-doer and could give nobody any authority, there is left, then, nothing except the oral direction by Treasurer Bartley of this payment, which, without such authority, would have been a conversion. So far as making this disposition of the money that was made is concerned, defendants are certainly in no better position, under their own testimony, than if they had taken the money of the state merely at Bartley's direction and paid it over to one who had no color of title to it. They confess they did this with regard to the payment to the Exchange Bank. May any citizen or corporation of the state go to the state treasury and get the state's money and deliver it as a final payment to one without a color of right, on the treasurer's mere oral direction? The treasurer's authority to pay out state money is found in subdivision 2, section 2,* article 4, chapter 83, Compiled Statutes, and is, "To disburse the public money upon warrants drawn upon the state treasury according to law and not otherwise." If the defendants had held a warrant entitling them, upon its face, to receive this money, and had in good faith presented it to the treasurer and he had honored such a war-

_____

* Cobbey's Annotated Statutes, sec. 9124.

rant, even though there was no claim against the state on the part of the holder, until the mistake was discovered and the defendants had knowledge or notice of it, they would have been at liberty to treat the action of the treasurer as valid and to pay the money over to the holder of the warrant. Such payment would have been within the apparent authority of the treasurer, and, therefore, protected as to one innocent of wrong. But they had nothing of the kind. Their warrant called for the payment of money, not to the Chemical National Bank, but to the state sinking fund; and, as above indicated, they must justify the payment either by the warrant according to its terms or without one. It seems tolerably clear that whatever may have been the degree of good faith on the part of these defendants, they can no more appeal to the assent of the treasurer as relieving them from liability for conversion than they can to the terms of the warrant which they used. Whatever the hardship of such a rule, it would seem indisputable that the same doctrine should be laid down for the wealthy and powerful that is prescribed for the poor and weak. Unless the state treasury is to be opened to everybody who can get the assent of the treasurer to the taking of funds out of it, only payments made by the treasurer in accordance with the statute can be held to be authorized or to be assented to by the state.

If the positions are correct that Bartley had no authority to sell, and none to pay the warrant, that its purchase and collection by the Chemical National Bank was a conversion both of the warrant and of the funds with which it was paid on the part of all concerned as principals and agents, and that neither the warrant nor the verbal direction of Bartley to pay it was an assent of the state to such payment, it follows that the request for a peremptory instruction for plaintiff against all defendants should have been granted. This would seem to dispose of the case. Some points raised by defendants, however, call for especial consideration.

The most earnest contention of defendants at the hearing, and the one to which the larger portion of their

briefs is devoted, is that there was no segregation of the money from the funds held by the bank as a depositary, and so no conversion. One of the briefs urges that there can be no conversion of money simply as such, and so no cause of action is alleged. Neither of these positions help the defendants, unless the last conclusion is allowed. This can not be done. If there has been no segregation of the state's money, these defendants still have it, and are holding it without right. If there is no action for conversion in the pleadings, there is one for money had and received. The allegations of the answers are simply that they "accounted" for the money to the New York bank, not that they have ever paid it over. The cases are numerous holding that where money is received for a principal without right to it, merely putting it to his credit does not relieve the agent of liability, even where the principal was at the time indebted to his agent and it was credited on the indebtedness. *Garland v. Salem Bank*, 9 Mass., 408, 6 Am. Dec., 86; *Cox v. Prentice*, 3 Mau. & Sel. [Eng.], 344; Story, Agency, sec. 300. It is said that the proof shows the money to have been all paid over by January 14, 1897; but it was taken under objection and in fact merely shows that on the books of the bank its New York correspondent at that time had a debit instead of a credit balance. The able counsel who drew the answer had no doubt thought of the effect on their claim of no segregation which a plea of payment over of the money would have. It would be somewhat hard even for them to show that it had been paid away without separation from the deposit fund.

The writer is of the opinion that a case of conversion of money is alleged. The claim is that defendants got the state's money from its treasurer by means of his check on the defendant bank without right, that both they and he knew they had none, and that thereby they converted it to their own use. The knowledge that it was the state's money and the fact that it was taken without color of lawful authority and with the intention to keep it from the treasury, make the money so taken specific. A right to recover it on the part of the state arose at once, which no

mingling of funds by defendants could defeat. Many of the cases cited by defendants to the point that no conversion arises upon the reception of money to another's use, expressly base their determination on the fact that no intention to misappropriate the money at the immediate time of its reception is shown. Its receipt by authority of the owner appears, and so a debt and not a conversion arises. This money, however, was taken expressly to be appropriated for the payment of this warrant to one who had no title. It was to pay to the ·Chemical National Bank for the latter's own use this money that by the terms of the warrant was to go to the state's sinking fund. But, as above suggested, the position that no conversion is alleged does not help the defendants any. One is shown. The sale of this warrant and the assistance of defendants in such sale, was a conversion on their part in any possible view of the transaction. Mr. Millard's testimony shows this was a bank transaction. It resulted in a large fund in the bank to the credit of a correspondent. The collection of the warrant and crediting of the money was a completion of the sale, and the illegality of that sale makes the receipt of the payment in any view tortious. Tort can be waived and the state recover on assumpsit for money had and received. *Carew v. Rutherford,* 106 Mass., 1, and cases cited; defendants' brief, p. 65. It is no defense, for money tortiously received, that it has been paid over to a principal. *Tugman v. Hopkins,* 4 Man. & G. [Eng.], 389; *Kleinwort Co. v. Comptoir National d'Escompte de Paris,* (1894) 2 Q. B. [Eng.], 157; *Arnold v. Cheque Bank,* 1 C. P. Div. [Eng.], 578; *Wright v. Eaton,* 7 Wis., *595. One wrong-doer can not escape by paying to another tort-feasor in the same transaction. If an immediate liability arose against defendants, because they received this money for the use of others than the state sinking fund, then surely they can not discharge that liability by paying over to those others these very funds. The petition clearly states facts on which an action would arise on assumpsit. The addition of the conclusion that "by reason of the premises" defendants wrongfully con-

verted the money to their own use would not vitiate this. *Conaughty v. Nichols,* 42 N. Y., 83. The view that no con-version is alleged and that the action is for money had and received, would admit evidence of any tortious conduct in the transaction of getting the money, including both the sale and collection of the warrant, as well as accepting the check in payment of it. Nothing would be gained, then, for defendants, by treating this as an action for money had and received. The real question would still be left, was taking this payment a legal wrong against the state of Nebraska? If it was, an action lies, whether getting the check was a conversion of money or not. The considering of the petition as one for money had and received makes the sale of the warrant through the agency of the defendants a more directly important feature than does the view that its collection by means of the check was a conversion.

The questions as to the admission of evidence all or nearly all relate to permissions of cross-examination which are claimed not to be at all pertinent to the examination in chief. It is hardly claimed by defendants in brief or argument that the cross-examination of the witnesses was kept within the limits of their examination by plaintiff. The claim made is that the facts shown in no event constitute a cause of action, and any error in latitude of cross-examination is entirely immaterial, as the verdict rendered was the only one possible. The discussion of this branch of the case need not be further prolonged. The rule in this country, differing from that of England, is that the cross-examiner must inquire as to the evidence in chief and not as to the whole case. It is impossible to see the relation of much of this cross-examination to the evidence of the state.

In the instructions, aside from the refusal of the peremptory ones which have been considered, the essential error claimed is that the question of defendants' knowledge of the facts as to the warrant was not submitted as a question of fact, but as a question of law. The jury were in effect told to find for defendants, if they did not find that the latter knew that Bartley had no right to draw

this check.  Substantially they were told that the deciding
point as to the liability or non-liability of the defendants
was whether they knew that there was no right to draw
this check.  The claim of the state that this was submit-
ting a question of law and defendants' judgment upon it
to the jury seems to be well founded.  The question was,
not as to their knowledge of Bartley's right, but of the
facts which went to establish or to remove such right.
Under the instructions given, the defendants might have
been entirely cognizant of all the facts as to the warrant
and Bartley's use of its proceeds and the purpose of the
appropriation under which it was drawn, and the state's
ownership, and yet, if they could convince the jury that
they supposed, as a matter of law, the treasurer had a right
to pay out the money on it by means of this check, there
could be no recovery.

As above stated, one who deals with a trustee, know-
ing him to be such, must ascertain the limits of his au-
thority.  This would seem particularly applicable to a
public officer, whose powers are fixed by public statute.
Can it be tolerated that money shall be taken, in such
quantities as here, out of the state's treasury, without
right, and the takers, with full knowledge of the facts, or
with complete failure to investigate them, be excused on
the plea, not that they supposed the treasurer had a right
to pay it to them, but that they did not know he was with-
out such right?  If the treasurer had been acting within the
scope of his apparent authority, the question as to defend-
ants' knowledge would be, not as to their legal conclusions
of his right or want of it, but as to their knowing or not
knowing the facts that would take away that right.  It fol-
lows, from what has been said, that in any view of this case,
instruction No. 4, given by the court, was wrong.  The jury
should not have been told that the liability of defendants
depended on their having reached the correct legal con-
clusion that Bartley had no lawful authority to pay the
warrant.  The same objection applies to No. 5, with its
direction to' find for defendants if the jury failed to find

that they knew the warrant was illegal and void and that the check was fraudulently drawn.

Paragraph No. 10 of the requested instructions seems to have been given on the theory that the check was payable to the Chemical National Bank and the part of the defendants in the transaction merely its payment on presentation. It in effect told the jury that paying the check alone would not make the bank liable even if it knew it was drawn to pay the warrant, and that such payment was unlawful. The instruction seems clearly misleading, considered in connection with either the pleadings or the proof. The check was to the defendant J. H. Millard, Pt. It is claimed that it was for the defendant bank. That bank pleads that it was acting as agent for its regular correspondent, the New York bank, in collecting the warrant. The proof shows that the money was placed in the defendant bank to the credit of the correspondent. This was a borrowing of the money, and borrowing from one known to have no right to lend is a conversion. *Arnold v. Cheque Bank, supra; Rice v. Clark,* 8 Vt., 109; *Kramer v. Wood,* 52 S. W. Rep. [Tenn. Ch. App.], 1113. If defendants knew there was no right in the New York bank to get this money, which they put to its credit in their own bank, they are clearly liable for it. This instruction seems manifestly erroneous.

The petition alleges that defendant Millard did what he did in his private capacity and not as agent or president. It is claimed that the proofs do not sustain this. This seems a superfluous allegation in an action based on tort. Whether it is held a proceeding for conversion of money or for money had and received, in either event a conversion is the foundation of whatever liability there is. In conversion all are principals. *Osborne Co. v. Plano Mfg. Co.,* 51 Nebr., 502. It would seem, therefore, that this allegation is simply a pleading of the legal effect of the acts and should be so treated.

It is therefore recommended that the judgment of the trial court be reversed, and the cause remanded.